2010 VT 58

## In re Jasdeep Pannu

[5 A.3d 918]

No. 09-115

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed July 22, 2010

*William A. Nelson*, Middlebury, for Contemnor-Appellant.

*William H. Sorrell*, Attorney General, *John Treadwell*, Assistant Attorney General, and *Andrew Delaney*, Legal Intern, Montpelier, for Appellee.

¶ 1. **Skoglund, J.** Attorney Jasdeep Pannu appeals from the trial court's order finding him in criminal contempt under Vermont Rule of Criminal Procedure 42(a). He argues that he did not violate a clear order of the court and that his behavior was not willfully disobedient. We reject these arguments and affirm the trial court's decision.

¶ 2. The contempt order arose as follows. Jasdeep Pannu was assigned to represent James Spearman, who was charged with aggravated sexual assault. Spearman, age thirty, allegedly engaged in repeated nonconsensual sexual acts with J.C., a thirteen-year old, between December 2007 and March 2008. The charge against Spearman arose after J.C. told her mother that she was pregnant, and indicated that an older male named "Jay" had impregnated her. J.C.'s mother contacted the Department for Children and Families (DCF). J.C. subsequently had an abortion, following which she admitted to her mother that Spearman had impregnated her.

¶ 3. Detective Tyler Kinney investigated the crime, and his supplementary investigative report included information about J.C.'s sexual history. J.C. apparently had been pregnant once before but miscarried. J.C. told her mother that an eighteen-year-

old man from Burlington impregnated her. In a separate case investigated in October 2006, J.C. admitted having consensual sexual contact with three unknown males at a residence in South Burlington. J.C. had also filled out paperwork at Planned Parenthood in April 2008, indicating that the father of her second child was an eighteen-year-old man. On the same form, J.C. reported having had four sexual partners in the past.

¶ 4. Citing the police officer's report above, attorney Pannu asked the trial court to order DCF to disclose all of J.C.'s juvenile records. Pannu asserted that these records might yield further evidence of J.C.'s prior sexual conduct that would fall within an exception to the rape-shield law. The rape-shield law expressly prohibits the admission of any evidence of the prior sexual conduct of the complaining witness with several exceptions. As relevant here, where such evidence "bears on the credibility of the complaining witness or it is material to a fact at issue and its probative value outweighs its private character, the court may admit: . . . [e]vidence of specific instances of the complaining witness' sexual conduct showing the source of origin of semen, pregnancy or disease." 13 V.S.A. § 3255(a)(3)(B). Pannu filed notice of intent to introduce evidence of specific instances of the complaining witness' sexual conduct under § 3255(a)(3)(B), although he did not identify any specific instances of sexual conduct in his motion. Pannu indicated that his motion was designed to overcome objections based on the rape-shield statute raised by the State during depositions. Pannu also sought the victim's medical records from Planned Parenthood. The State opposed defendant's requests.

¶ 5. The court held a motion hearing on February 20, 2009. It indicated at the outset that certain evidence — such as J.C.'s pregnancy and abortion — did not appear particularly probative of the charged crimes. It characterized testimony about J.C.'s abortion as simply inflammatory. The court later reiterated that the abortion evidence was prejudicial and that it was excluded. The court indicated, however, that if the victim had identified the father of her unborn child as an eighteen-year old, that statement would be admissible. The court cautioned, however, that it would not "get into a big circus about whether or not this child had intercourse with other people."

¶ 6. As noted above, Pannu also sought to introduce specific evidence from the victim's Planned Parenthood records. The court

allowed defendant to refer to the eighteen-year-old father mentioned by the victim in these records, but excluded all other information in these records unless the court heard otherwise from defendant. The court also informed counsel that the information about the alleged eighteen-year-old father could not be introduced through the investigating officer's affidavit, but instead must be admitted through the victim's medical records.

¶ 7. Pannu requested that he be allowed to use other information from the Planned Parenthood records, including J.C.'s statement about having four prior sexual partners. The State argued that this information was irrelevant, and the trial court asked Pannu to explain why it should be admitted. Pannu asserted that this evidence went to J.C.'s credibility given J.C.'s assertion that defendant was the only person she was having sexual contact with between a certain time. The transcript reflects the following exchange:

Court: That's excluded.

Pannu: Would I not be allowed to introduce that?

Court: No, you wouldn't. That's barred by rape shield.

The court explained, moreover, that the victim had never denied that she had previously had sex with others, and there was nothing in the medical record stating that she had had intercourse with four other people around the time that she became pregnant.

¶ 8. Finally, the court addressed Pannu's request concerning J.C.'s juvenile records. DCF provided the court with its records, which the court reviewed in camera. At a subsequent hearing, the court informed the parties that it had reviewed all of the DCF records and none were discoverable. The court also issued an entry order to this effect. Additionally, in late February, the court issued an order that specifically barred any discussion at trial of J.C.'s abortion, the alleged date of conception, or the fact that J.C. had a sexually-transmitted disease.

¶ 9. At a March 6, 2009 hearing, the court reiterated that the child's juvenile matters could not be introduced. Pannu then asked for clarification:

Pannu: Well, Judge, let's clear up the juvenile matters. I mean, part of that is the supporting probable cause affidavit.

The Court: All right. Well, you're not going to bring this in and neither is the State, from what I understand. No one is going to bring in this child's juvenile record period.

Pannu: I'm not going to bring them in, but I can use what was in the —

The Court: No. You can't use it in the case to impeach this child or to say she's not credible. You can't do that.

Pannu: Well, Judge, specifically, what it would be would be what the statements were that her mom made to the —

Court: Absolutely not. Absolutely not. You're going to cross-examine this child based on what her mother said to a DCF worker?

Pannu: No. I didn't say the child, Judge. I [said] the mom.

The Court: Well, you cannot bring in the juvenile court records.

¶ 10. After the State indicated that it was not going to call J.C.'s mother, the court found no basis for the introduction of evidence referenced above; it also excluded evidence that J.C. faced pending criminal charges and attended an alternative school. The court advised Pannu that if he believed the State opened the door to the admission of this evidence, he should approach the bench and the court would listen to his argument. As the court explained, "I don't want there to be a mistrial here. You know, we've got somebody being held in custody and I'm trying to get as much resolved in advance of trial so that the proceeding itself is efficient."

¶ 11. Again, Pannu stated that he was "not clear about the court's ruling with respect to juvenile records":

Pannu: This all starts with a report to [the Chittenden Unit for Special Investigations] and [DCF], so are —

The Court: So what?

Pannu: So in that report, once again, we have an eighteen-year-old gentleman being mentioned and not [defendant].

The Court: Well, look, look. If there is any — I have said repeatedly, if there is anything about her having intercourse with an eighteen-year old as opposed to [defendant], that can come in. . . . I mean, that can come in, but I'm not going — I don't want this to become a wade through her juvenile record. I've told you, I'm sure, more than once, Mr. Pannu.

Pannu continued to question the court about the admissibility of the alleged date of conception contained within the detective's affidavit. Pannu indicated that he would not ask the detective to testify to the date of conception, but would instead ask the detective what he learned during his investigation. The court responded that counsel would be asking for hearsay evidence, which was improper. Pannu continued to contest this point, and the court reiterated that it had "made specific rulings" and "those rulings stand." The court indicated that the "officer cannot be questioned about things that he's learned through hearsay while he's on the stand. That doesn't go to his credibility and it's clearly objectionable."

¶ 12. Trial commenced on March 9. Pannu indicated at the outset that he objected to the court's prior rulings precluding him from asking about sexually-transmitted diseases, the victim's abortion, and the alleged date of conception contained within the detective's affidavit. The court informed Pannu that they had been through this already at least three times. Nonetheless, almost immediately after he began his cross-examination of Detective Tyler Kinney concerning his December 2008 investigation report, Pannu asked the detective about inadmissible evidence.[1] The State objected, and the court sustained the objection. The court reiterated that the issue had been previously ruled upon and was not relevant or probative and did not go to the credibility of the witness. It emphasized to Pannu that "[y]ou cannot use cross-examination to bring in things which are not otherwise admissible."

---

[1] While the transcript indicates that defense counsel's question was inaudible, it appears from the context that the question related to the initial report made by the victim's mother to DCF.

¶ 13. Pannu then asked the detective about statements from others, contained within his report, that the man who impregnated J.C. was between twenty-four and thirty, as well as another statement that he was twenty-years old. Pannu asked the detective if the victim had also advised that the male responsible for the pregnancy was eighteen. The detective replied that she had not. Shortly thereafter, the following exchange occurred between Pannu and Detective Kinney.

> Pannu: And you also learned during your investigations, specifically paragraph 12, that . . . the complaining witness . . . mentioned three different names, right? That she could allegedly have had sexual contact with?

> State: Your Honor —

> Court: Oh, outrageous, Mr. Pannu. I am going to excuse the jury and have a little chat with the attorneys. . . . Mr. Pannu, there is a rape-shield statute. There have been several pretrial rulings. This question is directly violative of the direction you got from the Court. It's a direct contempt. I am going to caution you that I will have to take this up at the end of the trial. I do not want to have this repeated now. That's it.

Paragraph twelve of the supplementary investigative report provided a synopsis of an unrelated 2006 CUSI case involving the victim.[2] The court found that Pannu's questioning had been "disingenuous from the start." Pannu responded that he believed he could cross-examine the officer about his affidavit "when it referred to the different — the eighteen-year-old man that . . . we talked about before." The court responded:

---

[2] The paragraph provides:

> This investigation was conducted by CUSI Detective John Dunn on October 13, 2006. The Department for Children and Families made this report and advised [that the victim] disclosed about having consensual sexual contact with three unknown black males. [The victim] refused to provide the names of the three males involved but advised she had sexual contact with an 18 year old black male, a 23 year old black male, and a 24 year old black male at a residence in South Burlington, VT. The investigation was closed because [the victim] was uncooperative with the investigators.

No, Mr. Pannu, there is a specific ruling. You could refer to statements allegedly made that she had intercourse with an eighteen-year old. You were specifically told that that's all you could refer to because the eighteen-year old might have been a person, according to the statement, that impregnated her. You certainly were never told you could refer to three people with whom she had intercourse. . . . It's a direct violation of the Court's Order and it couldn't be clearer what's going on.

¶ 14. Trial resumed and not long thereafter Pannu asked Detective Kinney if defendant had expressed his willingness to take a DNA test. The detective replied no, indicating that defendant had offered to take a polygraph test, not a DNA test. Pannu asked again about DNA, and the detective replied "I don't recall him talking about DNA." The following exchange then occurred:

Pannu: "Okay. You — she — the complaining witness was impregnated, right?"

Kinney: Correct.

Pannu: And you actually got records from Planned Parenthood, correct?

Kinney: Correct.

Pannu: Okay. Did you check to see if they could in any way preserve the DNA evidence?

Kinney: I found out that she had the abortion — had an abortion several —

The court then stepped in, instructing the jury that "this is a subject which I have ruled previously should not be raised." The court allowed Pannu to finish his cross-examination, during which Pannu attempted to ask the detective about the alleged date of conception. The State objected and the objection was sustained.

¶ 15. When the examination of the detective was complete, the State moved for a mistrial and the court granted its request. The court found Pannu's questioning about the victim having sex with three other men to be an intentional direct violation of the rape-shield law and a direct contempt of the court's order. The

court also agreed with the State that the question about DNA testing clearly implied that there was something to test on which would have been a fetus or perhaps a baby, and it compounded the error. The court later issued a written order finding Pannu in direct contempt under Vermont Rule of Criminal Procedure 42(a). The court recounted the facts set forth above, reiterating that it had made several specific pretrial rulings that prohibited the defense from referring to the victim's sexual behavior. The court explained that on the morning of trial Pannu had asked the court to reconsider those rulings, which the court had denied, noting that the rulings had been made on at least three prior occasions. The court found beyond a reasonable doubt that Pannu's conduct was an intentional violation of the court's pretrial rulings and the rape-shield law.

¶ 16. The court explained that the contempt must be punished because it was committed "directly against the authority of the court, tending to impede or interrupt its proceedings or lessen its dignity." *In re Morse*, 98 Vt. 85, 90, 126 A. 550, 551 (1924). The court found that in this case the willful violation of the court's pretrial rulings and the rape-shield law was certain to provoke a mistrial motion, and Pannu's conduct caused additional expense and delay, not only in the trial of the instant case but also in the trial of other cases waiting to be heard. Countenancing such behavior, the court continued, would encourage the violation of court orders as a device to delay trial, and it found that unnecessary delay harms the judicial process. The court noted that this was not the first time that Pannu's conduct had caused a mistrial. In July 2008, Pannu engaged in similar behavior — knowingly asking a question that violated a pretrial ruling causing a mistrial — where the ruling had been made just before trial began. The court did not base its contempt finding on this earlier incident, however, but considered it in fashioning an appropriate sanction for Pannu's conduct. The court imposed a $2000 fine, which was roughly the equivalent to the cost of selecting the jury plus one day of trial. This appeal followed.

¶ 17. Pannu maintains that his behavior was not contemptuous because he did not violate any written or oral order by the court. He cites the court's February 25, 2009 order, which prohibited only discussion of J.C.'s abortion, the estimated conception date, and the fact that J.C. had a sexually-transmitted disease. Counsel acknowledges that the court made other oral rulings before trial,

but he asserts that none prohibited him from asking the detective about a DCF report that the victim engaged in sexual conduct with three men in 2006.

■ ¶ 18. As the trial court recognized, "criminal contempt is an act 'committed directly against the authority of the court, tending to impede or interrupt its proceedings, or lessen its dignity.'" *State v. Allen*, 145 Vt. 593, 600, 496 A.2d 168, 172 (1985) (quoting *In re Morse*, 98 Vt. at 90, 126 A. at 551). Plainly, an attorney's intentional violation of a trial court order falls within this definition. See, e.g., *Com. of Pa. v. Local Union 542, Int'l Union of Operating Eng'rs*, 552 F.2d 498, 509 (3d Cir. 1977) ("We have not the slightest doubt that flouting a trial judge's commands is the essence of obstructing the administration of justice."). The trial court has discretion in issuing a contempt order, and we will reverse its decision "only if the trial court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable." *In re Duckman*, 2006 VT 23, ¶ 7, 179 Vt. 467, 898 A.2d 734 (quotation omitted). We find no abuse of discretion here.

■ ¶ 19. We have stated in the civil contempt context that "before a person may be held in contempt for violating a court order, the order should inform him in definite terms as to the duties imposed upon him. The order must be specific and definite so that it leaves no reasonable basis for doubt as to its meaning." *Stalb v. Stalb*, 171 Vt. 630, 631, 768 A.2d 1269, 1271 (2000) (mem.) (quotations and citations omitted); see also *Morse*, 98 Vt. at 90, 126 A. at 551 (explaining that "a criminal contempt is one committed directly against the authority of the court, tending to impede or interrupt its proceedings or lessen its dignity, while a civil contempt is one which operates mainly to deprive another party to a suit of some right, benefit, or remedy to which he is entitled under an order of the court"). The United States Court of Appeals for the Second Circuit has similarly stated in the criminal contempt context that "[a]n individual must have fair notice of the court's commands before being punished for failing to comply." *Doral Produce Corp. v. Paul Steinberg Assocs.*, 347 F.3d 36, 38 (2d Cir. 2003). As that court explained, "[c]riminal contempt is punishable only where it is willful, that is, where it is committed with a specific intent to consciously disregard an order of the court, or where the defendant knows or should reasonably be aware he or she is in the wrong." *Id.* (quotations and citations omitted). In

other words, "where a judge has directed an attorney not to discuss certain issues, the order must be sufficiently clear that an attorney can discern what conduct falls within its scope." *Id.* at 39 (quotation omitted).

■ ¶ 20. There can be no doubt that counsel here was on notice that evidence concerning the victim's prior sexual conduct, with the exception of the victim's reference to an eighteen-year old who allegedly impregnated her in 2008, was barred. Not only was this evidence expressly prohibited by the plain language of the rape-shield law, but it was also wholly irrelevant, as the court stated before trial. That the subject of the victim's prior sexual encounters may have been discussed in the context of her Planned Parenthood records is of no moment. It was made abundantly clear to counsel that evidence of the victim's sexual history did not fit within any exceptions to the rape-shield statute and was inadmissible. Counsel cannot evade the court's ruling simply because this same information — with additional personal details — was contained within other documents. The onus was on defense counsel to secure the admission of any specific instances of the victim's sexual conduct before trial. If he believed this same information from the detective's affidavit was outside the court's ruling, he should have made that argument to the court. Indeed, the court "clarified" its ruling for Pannu numerous times. If Pannu remained confused, his remedy was to approach the bench, not to ask a question in direct defiance of the court's ruling.

■ ¶ 21. Counsel's conduct is particularly egregious given the purpose of the rape-shield law. The rape-shield law is intended to "screen the rape victim from unnecessary indignities and needless probing into her past sexual history." *State v. Patnaude,* 140 Vt. 361, 373-74, 438 A.2d 402, 407 (1981) (recognizing that "[t]he physical and emotional trauma of the incident are severe enough without aggravating the situation by putting the victim herself on trial for prior sexual intimacies with persons other than the assailant"). This law serves a critical purpose in the prosecution of sexual assault cases: "[b]y excluding worthless evidence, the legislature increased the reliability of the judicial system, increased the number of rapes actually reported and made it less likely that highly inflammatory information with no logical connection to the issues at trial would bring about unwarranted acquittals." *Id.* at 374, 438 A.2d at 407.

██ ██ ¶ 22. Indeed, it is the "peculiarly private" nature of such evidence that "presents great potential danger when placed in evidence in a rape trial." *Id.* at 376, 438 A.2d at 408. As Pannu must have been aware, such evidence "raises very real possibilities" that jurors "will find the conduct of a rape victim so alien to their own experience and morals, and so offensive, that they will be unable to comprehend how such a person could be raped." *Id.* at 376, 438 A.2d at 408-09. The introduction of such evidence also "runs the risk of turning the trial from an impartial examination of the incident in question to an inflammatory and titillating inquiry into irrelevant pages of the victim's life, confusing the issues and misleading the jury." *Id.* at 376, 438 A.2d at 409. Pannu's conduct wholly undermined the spirit and purpose of this law. The inevitable result, as the trial court found, was a mistrial. The court clearly has the discretion to punish such behavior so as to promote the proper and timely administration of justice. See *Allen*, 145 Vt. at 600, 496 A.2d at 172 ("The power to punish for contempt is indispensable to secure both the proper transaction and dispatch of business and the respect and obedience due to the court and necessary for the administration of justice." (quotation and emphasis omitted)).

¶ 23. We note that other courts have similarly upheld contempt citations for attorneys who violate rape-shield laws. See, e.g., *Ex parte Rose*, 704 S.W.2d 751, 757 (Tex. Crim. App. 1986). In *Rose*, for example, the defense attorney asked a rape victim about her sexual past, violating the mandate of the state's rape-shield law and the trial court's order that the statute was not to be violated. As "an attorney and an officer of the court," the court explained, the attorney "could easily perceive the thrust of the statute, and knew or should have known from the beginning that he was skating on thin ice. If he had needed clarification, he could have easily approached the bench outside the jury's hearing." *Id.* at 756. He chose to do otherwise, and the court concluded that he was properly held in contempt. *Id.* at 756-57; see also *McCullough v. State*, 5 S.W.3d 38 (Ark. 1999) (finding sufficient evidence to support trial court's finding that attorney was in direct contempt of court for his conduct in rape trial when attorney's pretrial motion to introduce evidence concerning victim's prior conduct was specifically denied on the ground that it was excluded under rape-shield statute, trial court warned attorney he would be subject to sanctions if he made reference to such evidence, and

attorney asked victim a question referring to such evidence the next day at trial). We reach a similar conclusion here.

¶ 24. Not only was this evidence barred under the rape-shield law and the court's ruling regarding that law, but the court also specifically barred any disclosure of the victim's DCF records, which was the source of the information in paragraph twelve of the detective's report. The court also warned counsel several times that he could not question the detective about hearsay statements contained within his supplemental investigatory report. Additionally, the court specifically informed Pannu that the information about the alleged eighteen-year-old father could not be introduced through the detective's affidavit, but instead must be admitted through the victim's medical records.

██ ██ ¶ 25. Under no circumstances could counsel have reasonably believed that his question about the victim's sexual encounters in 2006 was appropriate, and the court's finding that he willfully violated its prior rulings is amply supported by the evidence. The only purpose of this question was to intentionally prejudice the jury, and the court correctly characterized counsel's conduct as calculated and outrageous. It acted well within its discretion in finding Pannu in contempt. See *Local Union 542*, 552 F.2d at 509 (observing that an attorney who deliberately disregards the court's orders "offends the dignity and authority of the court," and that "[t]o hold otherwise would be to strip trial judges of their power to supervise the proceedings before them"). In reaching our conclusion, we need not address whether it was appropriate for counsel to ask the detective about DNA testing. The court did not rely on this question (or the detective's response to it) in its written contempt decision.

██ ¶ 26. Finally, we reject Pannu's assertion that his behavior was somehow justified by counsel's "duty of vigorous and effective advocacy." We rejected a similar argument in *Duckman*, and we find no basis for reaching a different conclusion here. See 2006 VT 23, ¶ 21 (recognizing that "contumacious behavior, namely, disobedience of a court order, cannot generally be excused as zealous advocacy"). The record plainly shows that the court evaluated what evidence concerning the victim's sexual history might be relevant. It allowed counsel to inquire about the victim's statements that she was impregnated by an eighteen-year-old man. The victim's 2006 sexual encounters, on the other hand, were

completely irrelevant and, as we stated in *Patnaude*, "worse than worthless." 140 Vt. at 380, 438 A.2d at 410. "Not only [did] it have no probative value, but it carrie[d] with it the great potential for unfair prejudice, confusion of the issues, and bogging the court down in collateral matters which is characteristic of evidence of past sexual conduct." *Id.* We wholly reject counsel's assertion that his question was somehow appropriate because it was couched in hypothetical language. Securing the admission of prejudicial evidence wholly lacking in probative value by defying court orders cannot be justified as "zealous advocacy." For all of these reasons, we find no basis to disturb the court's decision.

*Affirmed.*