NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 91

Nos. 2015-116 & 2015-276

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Miles Dow | February Term, 2016 |

David Suntag, J.

William H. Sorrell, Attorney General, David Tartter, Assistant Attorney General, Montpelier, and Tracy Kelly Shriver, Windham County State's Attorney, Brattleboro, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Sara Puls, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **DOOLEY, J.**  Following an altercation with his wife and an ensuing conflict with police, defendant was charged with several counts, related to his conduct both towards his wife and to the responding police officers.  During trial, based on improper questions from defense counsel, the court declared a mistrial on all counts involving defendant's wife (the complainant).  The trial continued, and the jury found defendant guilty of aggravated assault on a law enforcement officer with a deadly weapon and attempted simple assault by menace on a law enforcement officer.  Defendant appealed, arguing there was insufficient evidence, the jury instructions were faulty, and his convictions violated the Double Jeopardy Clause.  Defendant also moved to dismiss the charges for which a mistrial was granted, arguing that the grounds for a mistrial were insufficient and jeopardy had attached.  The court denied this motion, but granted defendant's

request to bring an interlocutory appeal. We have consolidated defendant's direct and interlocutory appeals. Defendant's aggravated-assault conviction is affirmed, his simple assault conviction is vacated, and the court's denial of the motion to dismiss is reversed.

¶ 2. The following testimony was presented at trial. Defendant was angry because he found out that the complainant had posted a revealing photograph of herself on the internet. On March 29, 2014, they were arguing and defendant began yelling and knocking items off of shelves. The complainant was frightened and called 911. Two police officers came to the house, and the complainant let them into the kitchen. Defendant was in a bedroom down the hall. The officers called to defendant to come out and talk to them. Defendant responded no and started yelling at them to get out of the house. One officer testified that defendant's voice was "aggressive" and in response the officer removed his Taser. When the officers went down the hallway, defendant came out with a knife, running down the hallway. One officer described defendant's weapon as a machete and stated that defendant was coming down the hall in an angry and determined manner. The officer stated that defendant had the weapon in his hand half-raised and he was fearful and felt threatened.

¶ 3. One officer drew his firearm, and the two began to look for cover. They left the house, and defendant followed them out onto the deck. The officers instructed defendant to drop the knife, but defendant held onto it and went back into the house. The complainant was left in the house with defendant, but exited a few seconds later when defendant went to the bedroom. Defendant then appeared on the porch. He was angry and yelling for police to shoot him. Defendant went back inside and then appeared again with pills and a glass of water. He took a large number of white pills. Defendant eventually agreed to come out of the house based on a promise that he could see the complainant. Police entered the house, and defendant was taken away by an ambulance.

¶ 4.     Following this incident, defendant was charged with seven criminal counts.[1]  Five of the charges involved defendant's actions towards the complainant: second-degree aggravated domestic assault, reckless endangerment, interference with access to emergency services, second-degree unlawful restraint[2], and attempted simple assault by menace.  Two charges related to defendant's actions towards law enforcement: aggravated assault with a deadly weapon on a police officer and attempted simple assault on a police officer by menace.

¶ 5.     During trial the court granted the State's request for a mistrial based on defense counsel's questioning of the complainant during cross-examination.  The court concluded that the questions were not relevant to any issue and were prejudicial to the State's case.  The court determined that the impact on the jury could not be ascertained and granted a mistrial on the charges that involved the credibility of the complainant.  The trial proceeded on the remaining two counts, and the jury returned a guilty verdict on those counts.  Following trial, defendant filed a motion seeking to bar retrial of the mistried counts, arguing that jeopardy had attached.  The court denied the motion, but granted defendant's request to bring an interlocutory appeal.

¶ 6.     Defendant now appeals both his convictions and the denial of his motion to dismiss.  As to the convictions, he contends (1) there was insufficient evidence to support the convictions; (2) the court erred in instructing the jury; (3) the court erred in admitting evidence of defendant's prior bad acts; and (4) the two convictions are for the same conduct and violate double jeopardy.  In his interlocutory appeal, defendant argues that the court erred in granting a partial mistrial, as well as that double jeopardy precludes retrial of the remaining counts.

## I.  Acquittal

¶ 7.     Defendant first argues that the State did not present sufficient evidence to demonstrate the specific-intent element required to prove aggravated assault with a deadly weapon

---

[1]  The information contained an additional charge of kidnapping, but no probable cause was found to support that charge.

[2]  The trial court dismissed this count following defendant's motion for lack of evidence.

3

and attempted simple assault.  This Court reviews the denial of a motion for acquittal de novo.  State v. Ellis, 2009 VT 74, ¶ 21, 186 Vt. 232, 979 A.2d 1023.  In reviewing whether a motion for acquittal was properly granted, this Court considers "whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt."  State v. Turner, 2003 VT 73, ¶ 7, 175 Vt. 595, 830 A.2d 122 (mem.) (quotation omitted).  A motion for judgment of acquittal will be granted "only if the State has failed to put forth any evidence to substantiate a jury verdict."  Id.

¶ 8.  Defendant's arguments focus on the specific intent required for the aggravated-assault and attempted-simple-assault charges.  Defendant was charged with aggravated assault, which the statute defines as when a person "is armed with a deadly weapon and threatens to use the deadly weapon on another person."  13 V.S.A. § 1024(a)(5).  This is a specific-intent crime, and the State must prove that "defendant subjectively intended to threaten the individual with the deadly weapon."  State v. Cahill, 2013 VT 69, ¶ 10, 194 Vt. 335, 80 A.3d 52; see State v. Bourn, 2012 VT 71, ¶ 11, 192 Vt. 270, 58 A.3d 236 (explaining that aggravated assault is specific-intent crime).  Similarly, to prove the intent element of attempted simple assault, 13 V.S.A. § 1028, the State was required to prove defendant intended to commit the assault.  See State v. Devoid, 2010 VT 86, ¶ 10, 188 Vt. 445, 8 A.3d 1076 (explaining that attempt requires intent to commit crime and overt act to carry out intent).  "Intent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence."  State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988).

¶ 9.  Defendant moved for a judgment of acquittal at the end of the State's case and renewed his request in a post-judgment motion.  The court denied the motions, concluding that the facts were sufficient for the jury to infer defendant's intent.

¶ 10.  On appeal, defendant asserts that his intent was to harm only himself and points to several facts in support.  While some facts could support a finding that defendant harbored an

4

intent to harm himself at certain times during the incident, this does not preclude a finding by the jury, based on other evidence, that defendant also intended to threaten the officers at the same or at different times during the incident. Here, the facts when viewed in the light most favorable to the State are as follows. After the police officers arrived at defendant's house, defendant was in a bedroom and yelling at the officers to leave. Defendant then came running down the hallway towards the officers in a determined manner. He was carrying a knife, described by one officer as a machete, and the knife was in a half-raised position. Defendant was angry, aggressive, and yelling. One officer was fearful and felt threatened. This circumstantial evidence, particularly the fact that defendant was angrily running down the hall towards the officers carrying a knife, was sufficient for the jury to conclude beyond a reasonable doubt that defendant acted with the specific intent to threaten the officers. See Cahill, 2013 VT 69, ¶ 12 (explaining that communication of intent through actions and surrounding circumstances sufficient to support verdict).

## II. Jury Instructions

¶ 11. Next, defendant argues that the court erred in instructing the jury on the intent element of the charges. The court generally instructed the jury that the State must prove defendant's mental state beyond a reasonable doubt, and that this intent could be proven by "circumstantial evidence." The court explained:

> It is not the secret intent of the defendant but that intent which can be determined from his conduct and all the other circumstances which surround it; that is, you may consider all the surrounding facts and circumstances including the defendant's words and actions, any relevant history in evidence and determine his mental state by inference from those surrounding facts and circumstances.

¶ 12. On appeal, defendant argues that the court erred by instructing the jury not to consider defendant's "secret intent" because in doing so the court failed to make it clear that the crimes alleged required the State to prove defendant's subjective specific intent. "We review jury instructions in their entirety to determine if they sufficiently guided the jury and did not have a

5

prejudicial impact on their deliberations." State v. Jones, 2008 VT 67, ¶ 23, 184 Vt. 150, 955 A.2d 1190.

¶ 13. Here, we conclude that the instructions as a whole "breathe[d] the true spirit and doctrine of the law" and therefore conclude there are no grounds for reversal. Id. The instructions, while referring to defendant's "secret intent,"[3] also provided detail about the intent elements for both offenses. In those specific instructions, the court explained that the State was required to prove defendant's subjective specific intent. As to the crime of aggravated assault with a deadly weapon, the court explained that the State was required to prove beyond a reasonable doubt that "the defendant, by words or actions or both, threatened to use the deadly weapon on a police officer," and "intended to threaten the law enforcement officer." Similarly, for the attempted simple assault count, the court instructed the jury that the State had to prove that defendant "intended to, that is, ha[d] the conscious objective of, making Officer Hammack afraid he was going to cause Officer Hammack immediate serious bodily injury."

¶ 14. These detailed instructions distinguish this case from those in which we have concluded the instructions were insufficient. In State v. Bourn, the trial court failed to give any instruction requiring "subjective moral culpability." 2012 VT 71, ¶ 16. In contrast, here, even though the court did not use the words "specific intent," the instruction adequately explained the required subjective moral culpability by stating that the jury was required to find defendant actually intended to threaten the officers. In addition, in State v. Cahill, this Court reversed based on a jury instruction that failed to require the jury to determine the defendant's subjective intent and instead suggested that the necessary mens rea could be arrived at "by the objective perception of a reasonable observer." 2013 VT 69, ¶ 19. The court made no reference to an objective intent that could have confused the jury and led to an improper evaluation of the intent element. Given

_____

[3] We note here that although in this instance the instructions as a whole accurately communicated the law, the use of this terminology is erroneous and we urge trial courts to use the correct statutory language.

6

the detailed instructions on the intent requirement, we conclude that the instructions as a whole provided an accurate statement of the law. See State v. Dann, 167 Vt. 119, 132, 702 A.2d 105, 113 (1997) (explaining that even if instructions were not "as well-worded as we or the appellant might desire, we will not reverse a conviction for error in the instructions" as long as instructions as a whole provided "true spirit of the law" and jury was not misled).

¶ 15. Defendant also claims that the court erred in failing to define the element of "threaten" in the jury instructions. For the aggravated-assault-with-a-deadly-weapon charge, the court instructed that the State was required to prove that defendant "threatened to use the deadly weapon on a police officer." The instructions did not specifically define "threaten." During the charge conference, defendant argued that the court should define threaten as "to express one's intent to harm or kill someone." The court rejected the suggestion as confusing because the charge was that defendant intended to threaten the officer, not that he intended to harm anyone. The court further expressed that this was not a difficult concept and no further definition was required. Defendant renewed his objection to this instruction before the jury retired.

¶ 16. We conclude that the court did not err in denying defendant's request to include his proffered definition of threaten. In charging the jury, the trial court "has a duty to avoid confusing the issues by 'over definition,' particularly when the word in question is one of plain meaning and may well be understood by its context." State v. Audette, 128 Vt. 374, 378, 264 A.2d 786, 789 (1970). Therefore, the court "may decline to enlarge upon or redefine a phrase or a term whose meaning may be taken to be plain and of common understanding." Id. at 379, 264 A.2d at 789. Here, the court did not err in declining to instruct the jury that "threaten" means "to express one's intent to harm or kill someone." As the trial court explained, there was a danger that including the definition proffered by defendant would confuse the jury as to the element of intent.[4]

---

[4] We also note that if there was any error here, it was harmless—the court's instructions regarding simple assault by menace did include the elements of a threat that defendant complains were omitted here and the jury convicted him of that offense.

7

## III. Prior Bad Acts

¶ 17. Next, defendant claims that the court erred in admitting prior bad acts of defendant. Prior to trial, the State gave notice that it intended to introduce into evidence prior bad acts of defendant, including three prior domestic assault convictions and threatening statements made to police shortly before the event. Defendant challenged the admission of any of this evidence. The court excluded defendant's statements to law enforcement. As to the prior domestic assault convictions, the court ruled that that evidence could be admitted as context evidence to explain the behavior of both defendant and the complainant, and that they were also admissible to demonstrate the mental states of defendant and the complainant in relation to the unlawful-restraint charge.

¶ 18. In compliance with this order, at trial, during the complainant's direct testimony she described two prior incidents involving defendant. She stated that in 2004 she was out with friends from work when defendant arrived and began waving a gun around. He slapped her with enough force to knock her down. She also stated that in 2008 she got in the middle of an argument between defendant and their son and defendant pulled her hair and knocked her over. Police responded to both incidents.

¶ 19. On appeal, defendant claims that the court erred in admitting this evidence. Under Vermont Rule of Evidence 404(b), evidence of "other crimes, wrongs, or acts" is not admissible to prove a person's character or propensity to commit a crime, but can be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." With allegations of domestic abuse, prior history of abuse may be admitted to provide "situational context" to a factual scenario that might otherwise seem "incongruous and incredible to a jury." State v. Sanders, 168 Vt. 60, 62, 716 A.2d 11, 13 (1998) (quotation omitted). The trial court's decision regarding whether the evidence is relevant under Rule 404(b) and more probative than prejudicial under Vermont Rule of Evidence 403 is entitled to deference. See State v. Jones, 2008 VT 67, ¶ 14, 184 Vt. 150, 955 A.2d 1190 (stating that review of court's decision to admit bad-act evidence is "only for abuse of discretion").

¶ 20. On appeal, defendant contends that the evidence was not admissible for context, and, even if the prior acts were admissible under Rule 404(b), the evidence should have been excluded under Rule 403 because its probative value was outweighed by the danger of unfair prejudice.

¶ 21. We need not reach either question because we conclude that any error in admitting the evidence was harmless. See V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). An error is harmless "if, absent the alleged error, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error." State v. Wright, 154 Vt. 512, 519-20, 581 A.2d 720, 725 (1989) (quotation omitted). The strength of the offending evidence and of the case absent the evidence are the two most important factors "employed in our inquiry." State v. Brooks, 2013 VT 27, ¶ 27, 193 Vt. 461, 70 A.3d 1014.

¶ 22. Here, the evidence to which defendant objects had no evidentiary import to the charges submitted to the jury. The evidence was about defendant's prior acts towards the complainant and did not relate to the charges committed against the officers. In addition, the State did not rely on this evidence to make its case because the State's case was sufficiently supported by the testimony of the arresting officers. Further, because the prior acts in this case were admitted as relevant to the charges involving the complainant, and those charges were taken from the jury's consideration by the mistrial ruling, the court instructed the jury not to consider the evidence in its deliberation.[5] In its instructions to the jury, the court reminded the jury that while it had heard "evidence regarding the history of the relationship between [defendant] and [the complainant]," that history was not relevant to the charges before them. We presume that the jury followed the

_____

[5] When it granted a partial mistrial, the court acknowledged that there could be some prejudice to defendant from the already-introduced prior bad acts involving defendant's relationship with the complainant, but concluded that there was no undue prejudice. The court explained that this possibility would have existed even without the mistrial and if defendant was concerned that such prejudice had existed, defendant could have moved to sever the counts prior to trial, but had not.

court's instruction.  Id. ¶ 29 (stating that jury is presumed to follow court's instructions).  Given that the evidence had little relevance to the charges, the State's case did not depend on it, and the court instructed the jury not to consider it, we conclude that any error in admitting the evidence was harmless beyond a reasonable doubt.  See id. ¶ 30 (concluding that any error in admitting evidence harmless where evidence of limited relevance, State's case supported by other evidence, and jury instructed to limit its use); State v. Williams, 2010 VT 77, ¶ 16, 188 Vt. 405, 9 A.2d 315 (holding that admission of prior incidents did not cause unfair prejudice where court specifically instructed jury not to consider evidence in assessing whether defendant committed assault).

IV.  Double Jeopardy of Two Assault Convictions

¶ 23.    Defendant argues that his convictions for aggravated assault with a deadly weapon and attempted simple assault by physical menace violated the Double Jeopardy Clause of the Federal Constitution.  U.S. Const. amend. V.

¶ 24.    Defendant did not raise this claim in the trial court.  On appeal, the State contends that by failing to raise the issue below, defendant waived it.  The State relies on State v. Callahan, which cited federal caselaw for the proposition that a double-jeopardy claim not raised pretrial or at trial is waived.  155 Vt. 571, 573, 587 A.2d 970, 972 (1991) (citing United States v. Bascaro, 742 F.2d 1335, 1365 (11th Cir. 1984) (holding that double-jeopardy claim waived when raised for first time on appeal)).  Since Callahan, however, the U.S. Supreme Court has clarified the difference between "forfeited-but-reversible error" and "waiver" of an error.  United States v. Olano, 507 U.S. 725, 732-33 (1993).  Forfeiture results from "the failure to make the timely assertion of a right," and those errors are reviewed under a plain-error standard.  Id. at 733.  Waiver results from "the intentional relinquishment of abandonment of a known right" and prevents any appellate review of a claim under the right.  Id. (quotation omitted).  Based on Olano, federal courts have held that where a defendant simply fails to assert a double-jeopardy claim, rather than affirmatively waiving it, he has forfeited his right and his claim is entitled to plain-error review. United States v. Lewis, 492 F.3d 1219, 1222 (11th Cir. 2007) (discussing impact of Olano,

abrogating Bascaro, and holding that double-jeopardy claim not asserted before trial court is forfeited not waived and defendant is entitled to plain-error review); accord United States v. Hernandez-Guardado, 228 F.3d 1017, 1028-29 (9th Cir. 2000); United States v. Branham, 97 F.3d 835, 842 (6th Cir. 1996); United States v. Penny, 60 F.3d 1257, 1261 (7th Cir. 1995).

¶ 25.    We conclude that defendant's claim was forfeited, not intentionally waived, and therefore, that we can review the claim.[6] Because defendant failed to raise it below, however, our review is for plain error and we will reverse only if there was an error that seriously affected substantial rights and had an unfair prejudicial impact on the outcome of trial. In re Carter, 2004 VT 21, ¶ 21, 176 Vt. 322, 848 A.2d 281.

¶ 26.    The Double Jeopardy Clause states that no person may "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This provision prohibits subsequent prosecutions for the same offense and the imposition of multiple punishments for the same offense. Wiley, 2007 VT 13, ¶ 8. The Legislature may, however, proscribe conduct by more than one criminal statute, and it is question of legislative intent whether a conviction and sentence may be had under each statute. Id. In evaluating whether two offenses are the same for double jeopardy purposes, we consider whether each statutory provision requires proof of a fact that the other does not. Id. "If this test is not satisfied, we must presume that the Legislature did not intend to authorize the imposition of cumulative punishments for the two offenses." State v. Breed, 2015 VT 43, ¶ 17, 198 Vt. 574, 117 A.3d 829.

¶ 27.    To prove aggravated assault with a deadly weapon, the State was required to prove that: (1) defendant was armed with a deadly weapon; (2) he intended to threaten to use that deadly weapon on a law enforcement officer; and (3) the law enforcement officer was performing a lawful duty at the time. To prove the attempted simple assault, the State was required to prove:

---

[6] Although we have not explicitly so held, we have in the past reviewed unpreserved double-jeopardy objections for plain error. See, e.g., State v. Wiley, 2007 VT 13, ¶ 7, 181 Vt. 300, 917 A.2d 501.

(1) defendant intended to put the officer in fear of imminent serious bodily injury; (2) defendant took physical action to accomplish his goal; (3) defendant's actions would have placed the officer in fear of imminent serious bodily injury if defendant had not been interrupted; and (4) the police officer was performing a lawful duty.[7]

¶ 28. We have held that, as charged and instructed here, simple assault is a lesser-included offense of aggravated assault with a deadly weapon. State v. Bolio, 159 Vt. 250, 254, 617 A.2d 885, 887 (1992). A lesser-included offense is one that is "composed of some, but not all, of the elements of the greater offense and does not have an element included in the greater offense." Id. at 252, 617 A.2d at 886 (quotation omitted). Therefore, by definition a defendant cannot be convicted of both the greater and lesser-included offenses. The State has presented no reason why the two convictions in this case do not violate double jeopardy principles. Therefore, we conclude that conviction for both offenses violates the Double Jeopardy Clause. We also conclude that allowing the two convictions to stand denies defendant a substantial right and is plain error.

¶ 29. Defendant asserts that the proper remedy is to vacate the conviction for the greater offense. Our case law is clear that the State has the right to choose which charge is to be dismissed. See State v. Gagne, 2016 VT 68, ¶ 44 n.3, __ Vt. __, __ A.3d __ ("The State is free to exercise its prosecutorial discretion to request that we vacate the greater conviction."); State v. Cahill, 2013 VT 69, ¶ 22 ("On remand, the State must move to vacate one of the convictions at its election."); State v. Rooney, 2011 VT 14, ¶ 34, 189 Vt. 306, 19 A.3d 92 (recognizing that when an action violates two criminal statutes, State has discretion to prosecute under either, as long as it does not "arbitrarily discriminate against an individual or class of individuals").

---

[7] We make one point here for the sake of clarity. The final element listed in each list regarding officers is derived from 13 V.S.A. § 1028(a)(1), which enhances penalties for simple or aggravated assault convictions if they are committed against law enforcement officers, firefighters, health care workers, or emergency personnel who are performing lawful duties at the time of the assault. We have listed the enhancer alongside the original elements of each offense to mimic the jury instructions.

12

¶ 30. Here, as in Gagne, the State has "clearly requested" that, in the event that we determine that both convictions could not stand, that we affirm the greater conviction. Gagne, 2016 VT 68, ¶ 44 n.3. Therefore, we vacate the attempted simple assault conviction.

## V. Mistrial

¶ 31. Defendant's next set of arguments involve the court's decision to grant a partial mistrial on counts related to the credibility of the complainant. Defendant contends that the court abused its discretion in granting a partial mistrial over his objection. He argues that no mistrial was warranted and that it was further error to effectively sever the offenses. Finally, he argues that the court erred in denying his subsequent motion to dismiss.

### A. Factual Background

¶ 32. The court's mistrial ruling stemmed from questions addressed to the complainant. On direct examination, the complainant testified that during her marriage to defendant, he had been "a little demanding, very jealous, [and] kind of controlling," and she provided examples of some of this controlling behavior. On cross-examination, defense counsel sought to introduce an exhibit containing the complainant's communication with another man on Facebook in which the complainant stated that she loved controlling men.

¶ 33. The defense lawyer asserted three theories of relevancy, each of which went to the complainant's credibility: that her testimony in response to questions from the State that she was leaving the marriage because defendant was too controlling was false; her statement to defendant that she was not contacting other men, as testified to in the State's direct examination, was false; and her testimony that she made the 911 call because she feared violence from defendant was false. With respect to the first theory, defense counsel argued that the Facebook posts would show that she had told another man that she liked a sexually controlling man and that statement was inconsistent with her testimony. With respect to the latter two, defense counsel argued that the complainant's Facebook messages right before the incident showed she was contacting other men and was terminating the marriage and the 911 call was a pretext in support of that objective.

13

¶ 34.    The State objected to this line of questioning on the grounds that it was irrelevant to whether defendant had committed crimes of domestic violence.  To the extent that the judge made a clear ruling at this point, it was that the State had opened the door by eliciting testimony to which the defense questioning responded.  The issue came to a head, however, when defense counsel disclosed that she intended to inquire about the exchange between the complainant and the named man, what she was going to ask and her theory of relevancy, and provided the court the text of the Facebook exchange.  While the trial judge indicated skepticism about defense counsel's theory of relevancy, the only ruling related to whether defense counsel had laid a proper foundation was as follows:

> THE COURT: Let me—let me try to be as clear as I can: This witness's motive to remove herself from the relationship with [defendant] and that she was planning on doing that before this can be a motive for testifying untruthfully, but you haven't asked her that.  You've started with some specific things which may or may not be relevant at the moment substantially outweighed by prejudicial impact.  If you want to cross-examine her whether she was planning on leaving him and whether she was trying to set him up, you can go ahead, and depending on those answers, then we can look at the specifics more clearly, but at the moment, you can't do it this way (indiscernible).
>
> [Defense counsel]: Okay.
>
> THE COURT: So if you want to explore whether she had another motive, she was planning on leaving, ask her.
>
> [Defense counsel]: Okay.
>
> THE COURT: We'll go from there.

¶ 35.    The defense lawyer followed the court's instructions and asked whether the complainant made the 911 call to facilitate her leaving the marriage.  The complainant denied planning to leave the marriage at that time and denied her plans were the cause of the 911 call.  At that point, defense counsel used the text of the Facebook interchange with the named man to refresh the complainant's recollection, over the State's objection.  Thereafter came the questions and testimony that formed the basis for the mistrial:

14

Q. And [the man] was talking about what he wants in a woman, and you had agreed that—

STATE: Objection.

THE COURT: Sustained.

Q. You talked about [defendant] being domineering and controlling; isn't that right?

A. Yes.

Q. And that that was one of the things—one of the reasons why you wanted out of the relationship; isn't that true?

A. Might I say how?

Q. No. I'm asking you whether or not it was because [defendant] was domineering and controlling that you wanted out of the relationship.

A. That was one of the reasons, yes.

Q. But isn't it a fact that actually men who are in control—you like men who are in control?

A. Depends on what kind of control, and that was where I was getting at—

Q. Okay.

A. —in saying how.

Q. Okay. So [the man] was talking to you about being in sexual control; isn't that right?

STATE: Objection.

THE COURT: Sustained.

Q. So what is it about the man in control that [the man] describes to you that's different than [defendant]?

STATE: Objection; relevance.

THE COURT: This is just following up on her answer—

STATE: Okay.

THE COURT: —and if she can answer the question, she should answer the question.

15

STATE: Then she should be allowed to answer the question.

THE COURT: Well, we're ready to get that now.

A. Okay. Now I can specify as to what I wanted to say. I have not had any friends throughout our marriage because he does not like me to go anywhere or do anything that does not involve him. I have had to walk to work several times because he would disable a vehicle so that I could not drive it. That's the kind of control that I'm talking about that I would prefer not to have in a relationship.

Q. So what's the kind of control that you want to have in a relationship with [the man]?

MS. SHRIVER: Objection; relevance.

THE COURT: Sustained.

¶ 36.    At the end of the complainant's testimony, the court asked the jury to submit any questions they had. A juror submitted a question inquiring whether it could consider the complainant's behavior in judging defendant.

¶ 37.    The following morning, the State moved for a mistrial, arguing that the questions posed during cross-examination were inappropriate and irrelevant. The State argued that the questions about the complainant's sexual preferences embarrassed and denigrated the complainant in way that was inappropriate and would prejudice the jury. The State contended that the juror question indicated that at least one juror was possibly improperly considering this behavior of complainant in its assessment of defendant's guilt.

¶ 38.    The court replayed the prior day's testimony. After rehearing it, the State argued that defense counsel's questions, particularly about sexual control and domineering behavior, served no purpose except to embarrass and humiliate the complainant and to prejudice the jury against her. Defendant argued that the questions were within the realm of appropriate cross-examination and were relevant to whether the complainant prefers someone who is domineering and controlling, and thus whether the complainant was actually afraid of defendant. Defendant argued that the State's motion was a strategy to avoid continuing a trial that was not going well

16

for the prosecution. Defendant contended that any error could be cured with a limiting instruction or by dismissing the juror who had asked the question.

¶ 39. The court explained that although defense counsel had not willfully violated a court order, the questions regarding the complainant's sexual preferences were not appropriate because they were not relevant to any of the issues at trial or to impeaching the complainant and they created undue prejudice. The court concluded that the questions created an implicit bias and unfairly undermined the witness's credibility. Although it was difficult to ascertain the effect on the jury, the court concluded that there was damage to the jury's ability to decide the case fairly and impartially.

¶ 40. The court discussed other possible means to address the prejudice created and concluded that there was no alternate way to cure the damage to the jury's ability to decide the matter fairly. The court was not convinced that a jury instruction would eliminate the danger of prejudice caused by the statement. Further, the court rejected defendant's suggestion that the problem could be solved by dismissing the juror who submitted the question about complainant's behavior. As the court explained at trial, the juror questions are submitted anonymously; therefore, even if the court thought this would be a legitimate solution, it was not a feasible one.

¶ 41. Accordingly, the court declared a mistrial "on the counts in which the jury will be required to assess [the complainant's] credibility in order to determine whether the case has been proven beyond a reasonable doubt." The court concluded that the testimony regarding the complainant would not have a negative impact on the other charges since those depended on the testimony and credibility of the police officers involved and not on the complainant's credibility. On appeal, defendant contends that the trial court erred both in granting a partial mistrial and in denying his motion to dismiss. He contends that this amounts to trying him twice for the same crime in violation of double jeopardy.

## B. Legal Standard

¶ 42. The constitutional protection against putting a defendant in jeopardy for the same offense twice attaches before a judgment becomes final because of a "defendant's valued right to have his [or her] trial completed by a particular tribunal." Arizona v. Washington, 434 U.S. 497, 503 (1978) (quotation omitted); see In re Dunkerley, 135 Vt. 260, 263, 376 A.2d 43, 46 (1977) (stating that jeopardy attaches with empaneling and swearing-in of jury). Retrial is not, however automatically barred "when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused." Arizona, 434 U.S. at 505. Defendant's right to have "the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his [or her] evidence to an impartial jury." Id. To justify a mistrial and avoid double jeopardy, the State "must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant." Id. This standard stems from a statement by Justice Story in which he explained that where an accused had not been convicted or acquitted, he could be put on trial again because "the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." United States v. Perez, 22 U.S. 579, 580 (1824).

¶ 43. The parties present different standards with which we should review the trial court's decision to grant a mistrial over defendant's objection—in other words whether there was "manifest necessity." The U.S. Supreme Court discussed this question in Arizona. In that case, the defendant was granted a new trial because the prosecutor withheld exculpatory evidence from the defense during the first trial. At the second trial, defense counsel told jurors that the prosecutor purposely hid statements from the defendant's lawyer and because of this misconduct, a new trial was granted. The State moved for a mistrial and the court initially declined to rule on the motion. The following day, after the motion was renewed, the court granted a mistrial, concluding that the

18

statements were irrelevant and inadmissible. The court did not expressly find "manifest necessity" or indicate that it had considered alternative solutions. The defendant filed a writ of habeas corpus in federal court alleging that a new trial would violate the Double Jeopardy Clause. The Ninth Circuit, in affirming the district court's grant of the writ, concluded that although the statement was improper there was no manifest necessity because the trial court had made no specific finding of such or addressed other alternatives. Arizona. 434 U.S. at 501.

¶ 44.    The U.S. Supreme Court reversed, holding that the Court of Appeals applied an incorrect standard of review. The Court explained that standard of "manifest necessity" could not be applied "mechanically or without attention to the particular problem confronting the trial judge," and that determining whether the "manifest necessity" standard had been met depended on the type of case. Id. at 506. At one extreme are cases where the prosecutor seeks a mistrial due to weaknesses in its own case. "[T]he strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." Id. at 508 (footnote omitted). At the other extreme are mistrials premised on a deadlocked jury. In those cases, the court's decision to declare a mistrial is "accorded great deference by a reviewing court." Id. at 510.

¶ 45.    The Court held that the situation in Arizona—where the mistrial was granted based on improper and prejudicial remarks made by defendant's lawyer—fell within an area "where the trial judge's determination is entitled to special respect" and afforded deference. Id. The Court explained that where the mistrial has been granted based on defense comments that may have affected the impartiality of the jury, an appellate court should "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." Id. at 511. There are important reasons "in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias." Id. at 513. First, the trial judge must have the power to curb improper statements or questioning by

declaring a mistrial without "concern that any time a reviewing court disagreed with [the judge's] assessment of the trial situation a retrial would automatically be barred." Id. Second, the trial judge has had the unique ability to see and hear the jurors, is "most familiar" with the case evidence and background, and has observed the tone of argument and the reaction of jurors. Id. at 513-14. The trial court is not required to make an explicit finding of manifest necessity or to "articulate on the record all the factors which informed the deliberate exercise" of discretion. Id. at 516-17.

¶ 46. Accordingly, this Court "must accord the highest degree of respect for a trial judge's evaluation of the degree of necessity for a mistrial." State v. Corey, 151 Vt. 325, 330, 561 A.2d 87, 90 (1989). However, notwithstanding the court's discretion in ruling on a mistrial motion, a trial court "should not grant the motion unless the moving party establishes prejudice." State v. Jones, 160 Vt. 440, 449, 631 A.2d 840, 847 (1993). When the State requests a mistrial over a defendant's objection, "the prosecutor must shoulder the burden of justifying the mistrial if he [or she] is to avoid the double jeopardy bar. That burden is a heavy one." Arizona, 434 U.S. at 505; accord Corey v. Dist. of Vt., Unit #1, Rutland Circuit, 917 F.2d 88, 92 (2d Cir. 1990) (noting state must show mistrial is "demanded by a high degree of necessity" (quotation omitted)).

C. Analysis

¶ 47. The facts of this case simply do not meet the high bar outlined above. Although it is true that courts across the country have ordered and upheld mistrials in a number of cases where improper questions created prejudice, each of those cases involved the contravention of the court's specific instructions, a Rape Shield Law, or a specific rule of evidence. See Stacy v. Manis, 709 S.W.2d 433, 434 (Ky. 1986) (granting mistrial for question to prosecution witness about previous burglary conviction as "particular felony cannot be identified if the witness admits the prior conviction"); Ex parte Irving, No. 03-03-00346-CR, 2004 WL 392898, at *1 (Tex. Ct. App. Mar. 4, 2004) (unpub. mem.) (concluding question posed by counsel was "within the scope of the court's order" to ask for ruling before inquiring as to contacts between police and prosecution witness such that mistrial was appropriate); Birdsong v. State, 680 S.E.2d 159, 162 (Ga. Ct. App. 2009)

20

(holding defense question "undisputedly concerned his wife's past sexual behavior and was therefore subject to the restrictions of the Rape Shield Statute")[8]; see also Arizona, 434 U.S. at 499-500 (noting that basis for mistrial—defense counsel's opening statement—referred to inadmissible evidence). Nothing of the kind is present in the instant case. It is undisputed that there were no pretrial orders restricting defense counsel[9]; no Rape Shield or comparable law applied; no inadmissible evidence was referred to, and no answers were given to the offending questions; as well as that the jury had been told "many times" that attorney questions are not evidence to be considered. Indeed, the trial judge had a number of opportunities to rule that the line of questioning asked for inadmissible evidence and failed to do so even though defense counsel fully disclosed what testimony she sought. On hearing the first question, the court did not explain its ruling to make clear that the whole line of questioning would be improper. The ruling on the necessary foundation and the authorization for defense counsel to refresh the complainant's memory with the text of the Facebook exchange suggested that at least in part defense counsel would be successful in asking the questions she did.

---

[8] The same can be said of In re Pannu, 2010 VT 58, 188 Vt. 279, 5 A.3d 918, the one case that the prosecutor referenced in her argument to the court that a mistrial was warranted. In Pannu, we upheld a finding of criminal contempt against an attorney whose repeated questioning of a statutory rape victim about prior sexual experiences was deemed an "intentional direct violation of the rape-shield law and a direct contempt of the court's order" barring questions of that kind, necessitating a mistrial. Id. ¶ 15. The "particularly egregious" behavior of counsel in that case— asking multiple questions and receiving answers about the victim's sexual past, in violation of the pretrial rulings and the plain language of the rape shield law—is incomparable to the situation in this case, where no answers were given and no pretrial orders had been made. Id. ¶ 21. The court acknowledged this fact, asking the prosecutor if there was "[a]ny other law [she] want[ed] to bring up here other than a Rape Shield case with contempt"; indeed, the prosecutor herself admitted that she "[didn't] think this case is as egregious as [Pannu]" but that there was nevertheless "some correlation" between the two sets of facts.

[9] The prosecution argued that although defense counsel did not willfully violate a court order in this case, the questioning had been preceded by several objections by the State and cautionary instructions by the court. We find this rationale unpersuasive. Were we to allow questions to form the basis of a mistrial simply because they had been objected to by opposing counsel, the judicial system would be rendered unworkable.

¶ 48. Indeed, defense counsel's conduct here was far more innocuous than that of the attorney in Morris v. Livote, 962 N.Y.S.2d 59 (App. Div. 2013), a case where a mistrial ruling was reversed. In Morris, a defense attorney asked a testifying police officer multiple questions about a civil rights lawsuit that had been filed against him some years previously, despite being instructed at a sidebar conference that he could not ask about the lawsuit or the subsequent settlement. Id. at 61. The court granted a mistrial, finding that counsel had "flagrantly disregarded" the court's ruling about the scope of cross-examination, "intentionally ignor[ing]" its directions in order to taint the jury, such that jurors would have to perform "mental gymnastics" to disregard the references. Id. The Appellate Division reversed, concluding that while the attorney's disregard of the court's instructions was "blameworthy and understandably angered the court," his actions still "did not rise to the level of the gross misconduct displayed in cases in which retrial was permitted," the witness's testimony was not material, and more specific curative instructions or a jury poll would have been appropriate remedies. Id. at 62 (quotation omitted).[10]

¶ 49. If intentional, repeated questions in violation of a clear court directive do not "rise to the level . . . of gross misconduct" contemplated in Morris, we are unable to see how two unanswered good-faith questions to which objections were sustained clear that high hurdle. To that end, we believe this case is most similar to Hernandez v. State, 537 S.E.2d 149 (Ga. Ct. App. 2000). In Hernandez, during a trial for robbery, counsel for the defendant questioned a witness for the prosecution, who had participated in the robbery but had accepted a plea agreement in exchange for a reduced sentence, about the benefits of the deal, including the fact that if he had been sentenced for his part in the robbery, he would have been ineligible for parole. Id. at 151.

_____

[10] The dissent discounts Morris because the court gave as a secondary reason that the officer's testimony was not material because he did not remember the incident. This reason, which was secondary, should be viewed in context. The defendant was charged with drug sales to an undercover police officer, and the sale was observed by the testifying officer and another police officer. The testifying officer performed the arrest. The defense theory was that the settlement in the civil rights case for false imprisonment for $25,000 demonstrated the officer had previously fabricated evidence to obtain a conviction and a charge based on his involvement was therefore unreliable.

Following arguments from the prosecution that the defense was "attempting to create sympathy in the jury" for the defendant, which might lead them to acquit him altogether rather than have him subject to sentencing without parole, the court ordered a mistrial. Id. The Georgia Court of Appeals reversed, holding that cross-examination of this kind is proper because it is constitutionally protected:

> Defense counsel sought to show [the witness's] motive, bias, or interest in cooperating with the State and testifying against [the defendant]. A crucial difference exists between this type of cross-examination and mere impeachment by showing contradictory facts or a general lack of trustworthiness because of a prior criminal conviction. The former is constitutionally protected, while the latter is not. A witness's bias may be exposed by showing that he has benefitted or hopes to benefit from his cooperation with the prosecution in this case.

> The prosecutor's concern that revealing a sentencing differential would engender sympathy for [the defendant] may well have been realistic. But any such reaction was inherent in the facts of the case. The evidence showed that [the defendant's] role in the crimes was more passive than that of the other two participants. The State was responsible for the sentencing disparity by offering reduced sentencing in exchange for testimony against [the defendant]. Moreover, the State did not move in limine to limit cross-examination. If genuine concerns existed, they could have been addressed by establishing proper boundaries or by carefully instructing the jury.

Id. at 152-53 (citations omitted).

¶ 50.  As in Hernandez, defense counsel in the present case was attempting to elucidate the complainant's motive, bias, or interest in cooperating with the prosecution. As stated in conversation with the court, defense counsel asked about the complainant's attraction to controlling men as part of a broader theory that the complainant had not called the police out of fear as the State contended, but rather, because she was planning on divorcing her husband—as evidenced through her intimate discussions with other men—and as such, was "testifying untruthfully" in court. Moreover, the court recognized that some sexually-related material was "already in the case through the State's own evidence of [the witness]," thereby complicating the issue of how prejudicial these questions truly were. Finally, the prosecution made no pretrial

motions in limine on this issue; indeed, as defense counsel noted, the request for a mistrial came in the day <u>after</u> cross-examination, rather than during the questioning, and no limiting instruction was requested.

¶ 51. We stress here that in concluding that the mistrial was unwarranted, we are not similarly holding that the evidence defense counsel sought to have admitted was admissible. On the other hand, we believe that the questions alone, particularly in this case where evidence shows that the complainant posted topless photos and engaged in intimate conversations online, do not show the degree of prejudice that the State argues.

¶ 52. To that end, the dissent suggests that we improperly focus our analysis on the defense attorney's good faith and the lack of any pretrial rulings, arguing these issues are of "minimal relevance" to the question of whether the trial court abused its discretion, because a review of a decision to grant a mistrial should focus on whether the comments "may have affected the impartiality of the jury." <u>Post</u>, ¶ 66. The dissent then argues that because the court acted "responsibly and deliberately" in evaluating the presence of prejudice, all further inquiry should end and we should accord enormous deference to the trial judge's assessment of whether bias was created. <u>Post</u>, ¶ 68 (quoting <u>Arizona</u>, 434 U.S. at 515). But although we recognize that our standard of review on this question requires that we rely on the trial judge's observations in the courtroom, it does not dictate that we overlook the evidence—or the absence thereof—in order to uphold a trial court ruling. See <u>Arizona</u>, 434 U.S. at 514 ("Our conclusion that a trial judge's decision to declare a mistrial based on his [or her] assessment of the prejudicial impact of improper argument is entitled to great deference does not, of course, end the inquiry . . . . In order to ensure that [the defendant's constitutional] interest is adequately protected, reviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion' in declaring a mistrial. Thus, if a trial judge acts irrationally or irresponsibly, his [or her] action cannot be condoned (citations omitted)).

24

¶ 53.    That the dissent references only the trial court's bare assertion that there was prejudice, rather than any actual bases for this finding, demonstrates the fact that despite the significance of the constitutional right at play, the trial court simply did not establish that prejudice had actually been incurred.  See Puppolo v. Donovan & O'Connor, LLC, 2011 VT 119, ¶ 15, 191 Vt. 535, 35 A.3d 166 (mem.) (stating we must reverse an abuse-of-discretion ruling if discretion was abused or withheld and abuse "resulted in prejudice to a party's substantial rights" (alteration and quotation omitted)).  Instead, it referred only to "implicit biases" and "implicit views" that the complainant might not be credible, as well as to a juror query regarding whether her behavior could be considered in assessing defendant's guilt.  The juror's question could have referred to the complainant's other conduct—for example, posting the photos—rather than whatever would have been revealed if the questions were answered.  In fact, the trial judge said as much, acknowledging that the parties "shouldn't presume" that the inquiry was referencing the improper sexual allusions as the relevance of a complainant's actions to a defendant's crime is "a legitimate question in any case."  See In re John L. Norris Trust, 143 Vt. 325, 327, 465 A.2d 1385, 1387 (1983) (noting discretionary rulings must at least be supported by "credible evidence" to avoid reversal).

¶ 54.    We are also not convinced that a jury instruction to disregard the offending questions, reinforcing specifically the warning that lawyer's statements are not evidence, would have been insufficient to cure the potential prejudice that the court found.  In rejecting this option, the court said only that:

> The only question is whether or not that's a message that can be negated in some way, as it should be, so that the jury could be left with an ability to nevertheless consider credibility issues—and there are some obviously, but credibility issues on the part of [the witness] fairly.  That's a difficult assessment because what we're talking about here is implicit notions, not direct.
>
>  . . . .
>
> [B]y the time those questions came out, the inference from those questions was something that wasn't admissible, objection was sustained and did raise an issue for the jury, at least implicitly, that they should not have been confronted with.  Implicit views, implicit

25

biases are difficult to calculate by any objective measure, and that's the problem here.

This jury could have heard that, and in assessing a case where it's simply that witness's credibility which is going to determine whether or not they find proof beyond a reasonable doubt on certain crimes can significantly affect that determination, and I don't know how to cure that here.

¶ 55. We see nothing in this explanation that distinguishes this case from any other in which an improper question was asked but disallowed. Under this explanation, a mistrial is the only acceptable answer in every case. We also don't find great weight to the other factors in the equation. The questions were asked in good faith and in the absence of a clear ruling prohibiting them and the questions, or parts of a question uttered before the objection came, are not themselves evidence and, in fact, gave the complainant the opportunity to explain the controlling behavior of defendant to his detriment.

¶ 56. We therefore conclude that the decision to grant a mistrial failed to evince that "careful consideration" was accorded to defendant's "valued right" to have his trial completed by a single tribunal. Arizona, 434 U.S. at 502, 505, 516; see also State v. Moeck, 695 N.W. 2d 783, 797 (Wis. 2005) (finding "circuit court did not exercise sound discretion in declaring a mistrial when it failed to give adequate consideration to the State's ability to refer to the defendant's silence and to the effectiveness of a curative jury instruction" when defense opening statement presented version of events that countered that of prosecution witnesses, but defendant did not testify). Because we find the court committed error in declaring a partial mistrial, we need not address defendant's argument regarding severance.

¶ 57. Finally, we consider the effect of the trial court's erroneous declaration of a mistrial on the second degree aggravated domestic assault, reckless endangerment, and interference with access to emergency services charges. Because it is unquestioned that jeopardy attached when the jury was empaneled and sworn in, see Illinois v. Somerville, 410 U.S. 458, 467 (1973), and because we have ruled that the mistrial was an abuse of discretion that did not evince the "manifest

26

necessity without which the ends of public justice would otherwise be defeated," we hold that the Double Jeopardy Clause precludes retrial of defendant on the mistried charges. Reporter's Notes, V.R.Cr.P. 33 (quotation omitted); see Somerville, 410 U.S. at 466 ("When one examines the circumstances surrounding the discharge of this jury, it seems abundantly apparent that the trial judge made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the sua sponte declaration of this mistrial. Therefore, we must conclude that in the circumstances of this case, appellee's reprosecution would violate the double jeopardy provision of the Fifth Amendment." (quotation and citation omitted)).

The aggravated-assault conviction is affirmed. The attempted simple assault conviction is vacated. The court's denial of the motion to dismiss is reversed.

FOR THE COURT:

_____
Associate Justice


¶ 58. **REIBER, C.J., dissenting.** Defense counsel asked improper and irrelevant questions during cross-examination of the key witness for the State on several charges. These questions about the victim's interactions with other men and her sexual preferences were objected to and sustained before the witness could answer, but the questions nonetheless created implications that could undermine the witness's credibility and could bias the jurors against her. The trial judge, who had the unique ability to listen to the tone of the questioning and observe the jurors' reactions, determined that the questions denigrated the victim, created bias, and irreparably prejudiced the State's case, and thus granted a mistrial. The majority reverses, concluding that the court abused its discretion because, in the majority's assessment, no actual prejudice was proven. The majority errs by focusing mainly on whether counsel's improper and irrelevant questions were made in good faith or in violation of a clear court directive, and failing to give the trial court

27

sufficient deference on the most important determination—the extent of bias created. Because I would affirm the grant of a mistrial, I dissent from Part V of the majority opinion.

¶ 59. As the majority recounts, the trial court's mistrial ruling stemmed from questions addressed to defendant's wife, the victim of several of the charges against defendant. On cross-examination, defense counsel sought to introduce an exhibit containing the victim's communication with another man on Facebook in which the victim stated that she loved controlling men. Defendant proffered that it was relevant to rebut her claim that she was afraid of defendant's domineering and controlling behavior. The court rejected this request, concluding there was no relevance.

¶ 60. The ensuing questions were defendant's attempt to make the conversation relevant somehow. Counsel first attempted to introduce it as relevant to the victim's motive for leaving defendant and for calling 911. The following exchange took place:

> Q. Isn't it a fact that you were planning on leaving [defendant] before these events occurred?
>
> A. Honestly, I have planned on leaving him for many, many, many years, several times.
>
> Q. And so certainly—and you were talking to other—you said you had these friends on Facebook, both men and women, but you were having some very intimate conversations with men at the time; isn't that right?
>
> A. Yes.
>
> . . . .
>
> Q. Okay. Isn't that why you called 911? You've had it with [defendant], you're done. Isn't that why?
>
> A. No, that is not why, and I have called them in the past and that was not why.

¶ 61. Defense counsel proceeded to ask whether the victim wanted to leave the marriage because defendant was "domineering and controlling," and the victim agreed it was one of the reasons. Counsel then stated "But isn't it a fact that actually men who are in control—you like

28

men who are in control?" When the victim answered "Depends on what kind of control," counsel further asked "So [the man the victim communicated with on Facebook] was talking to you about being in sexual control; isn't that right?" The court sustained the State's objection to this question. Defense counsel asked the victim to differentiate between the kind of control she liked and the control exerted by her husband, and then asked, "So what's the kind of control that you want to have in a relationship . . . ?" Again, the court sustained the State's objection.

¶ 62. It was defense counsel's questions about the victim's sexual preferences and implication of sexual contact with other men that motivated the State the following morning to move for a mistrial. The court made a thorough examination of the record and listened to arguments from both sides before granting the motion.

¶ 63. The State argued that defendant's questions, particularly about sexual control and domineering behavior, served no purpose except to embarrass and humiliate the victim and to prejudice the jury against her. Defendant claimed that the questions were within the realm of appropriate cross-examination and were relevant to whether the victim had a preference for someone who is domineering and controlling, and thus whether the victim was actually afraid of defendant. Defendant contended that any error could be cured with a limiting instruction.

¶ 64. The court's ruling was prefaced by a thoughtful explanation. The court noted that although defense counsel had not willfully violated a court order, the questions regarding the victim's sexual preferences were not appropriate because they were not relevant to any of the issues at trial or to impeaching the victim and created undue prejudice. The court concluded that the questions created an implicit bias and unfairly undermined the victim's credibility. The court explained that while it was difficult to ascertain the effect on the jury, it concluded that there was damage to the jury's ability to decide the case fairly and impartially. Thus, the court granted a mistrial.

¶ 65. To avoid the bar of double jeopardy, a mistrial granted to the State over defendant's objection must be supported by " 'manifest necessity.' " Arizona v. Washington, 434 U.S. 497,

505 (1978). The standard for reviewing the trial court's determination of manifest necessity in this case is highly deferential because the mistrial was granted based on improper and prejudicial remarks made by defendant's lawyer. The decision falls within an area "where the trial judge's determination is entitled to special respect" and afforded deference. Id. at 510. Under this standard, this Court should "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." Id. at 511.

¶ 66. The majority concludes that the trial court abused that discretion here and instead makes its own finding that there was no danger of prejudice or bias. In so concluding, the majority places most emphasis on its assessment that the questions in this case were not in violation of a direct court instruction or evidentiary rule and that the attorney asked the questions in good faith. The attorney's good faith and the lack of a pretrial ruling are of minimal relevance to the question of whether the court abused its discretion because the "necessity" of a mistrial focuses on whether the improper comments may have affected the impartiality of the jury. Id. at 511-14. Further, even if the context in which the questions were made is considered, the conclusion to be drawn from that analysis is not as clear cut as the majority presents.

¶ 67. Defense counsel was well aware that the relevancy of the victim's communication with other men and her sexual preferences to any issue at trial was tenuous and that it was highly prejudicial. When defendant first sought to introduce the Facebook statements, the court rejected counsel's proffer that it was relevant to whether the victim was afraid of defendant. The court warned: "This is obviously quite prejudicial. The question is whether it's outweighed by probative value." The court explained that there could be some relevancy if defendant could demonstrate that the victim was trying to set defendant up, but that no such basis had yet been made. During the subsequent questioning there were several objections that the court sustained, including asking

whether the man the victim was communicating with asked about being in sexual control.[11] Defense counsel persisted, however, and continued asking about the victim's relationship with her Facebook friend. Therefore, it is clear that defense counsel was aware that the line of questioning involved evidence with limited relevance and high prejudicial effect. The trial court found, and the majority seems to agree, that the questions were improper and sought to introduce evidence that was not relevant, but was prejudicial. Therefore, although there was no specific prior directive precluding the questions, the questions did seek to admit evidence in contradiction of evidentiary rules. See V.R.E. 402 (stating evidence that is not relevant is not admissible); V.R.E. 403 (explaining that evidence may be excluding if probative value is substantially outweighed by danger of unfair prejudice).

¶ 68. Most important to the evaluation of whether these questions necessitated a mistrial was the court's evaluation of whether they prejudiced the prosecution and created bias in the jury. The trial court acted "responsibly and deliberately" in evaluating this and in granting the State's request for a mistrial. See Arizona, 434 U.S. at 515. The court correctly determined that the questions were improper and irrelevant to the proceeding and were prejudicial. See Stacy v. Manis, 709 S.W.2d 433, 434 (Ken. 1986) (holding that defendant's improper question of prosecution witness caused serious and improper prejudice to state's case and therefore mistrial was proper and no jeopardy attached); Ex parte Irving, No. 03-03-00346-CR, 2004 WL 392898, at *2 (Tex. Ct. App. Mar. 4, 2004) (unpub. mem.) (holding that defendant's improper question to complaining witness tainted witness's credibility and formed proper basis for granting mistrial). The questions regarding the victim's interaction with other men on Facebook and her sexual preference for domineering men were not relevant to an issue to be decided at trial and had the potential to create

---

[11] The majority claims that the fact there were several objections by the State is not relevant. Again, I reiterate that it is the content of the statements and their effect on the jury that is most important. If context is considered, however, it is certainly relevant that defense counsel had been warned about the line of questioning and then proceeded to continue asking questions even after the State objected and the court sustained those objections.

31

bias in the jury against the victim. See Birdsong v. State, 680 S.E.2d 159, 163 (Ga. Ct. App. 2009) (concluding that improper question to complainant created prejudice and therefore court acted within its discretion in granting mistrial). Further, the victim was a critical witness for the State on these charges so any bias created against her would critically prejudice the State's case.

¶ 69. The fact that there was no pretrial ruling or that defense counsel acted in good faith does not alleviate the impropriety of the questioning or the prejudice created by those questions. The majority fails to recognize the importance of those factors in the cases it cites. The majority provides Morris v. Livote, 962 N.Y.S. 2d 59 (App. Div. 2013), as an example of a case that is even less extreme and in which the appellate court held that the improper questions did not require a mistrial. The majority characterizes that case as a situation where the questions were in disregard of a specific court instruction and that even so a mistrial was not warranted. What the majority fails to recognize is that the main reason the appellate court concluded a mistrial was not necessary in that case was that the impropriety did not significantly prejudice the prosecution's case because the witness being examined when the improper questions were made was not material and therefore there was no significant prejudice to the state's case. Id. at 62.

¶ 70. Further, the court did not act "precipitately" in granting the State's request; an important consideration under the U.S. Supreme Court's framework. Arizona, 434 U.S. at 515 (holding court acted properly—"The trial judge did not act precipitately . . . ."—where it properly assessed impact of evidence and afforded consideration to both sides' arguments). The court reviewed the record and afforded both sides an opportunity to explain their positions. The court considered alternatives and concluded that no other remedy, including a limiting instruction, would suffice because there was no reasonable means to measure the possible prejudicial impact on the jurors. The trial court was in the best position to judge whether the improper questioning and the implication created regarding the victim's sexual preference created bias of such magnitude that it could not be cured by an instruction to the jury. See id. at 513-14 (explaining that trial judge's decision on whether an alternative is sufficient is entitled to deference). The court acted within its

32

discretion in determining that an instruction would have been inadequate to cure any prejudice created by those questions.

¶ 71. The majority dismisses the trial court's assessment of prejudice and faults the trial court for failing to "establish that prejudice had actually been incurred." Ante, ¶ 53. The majority is totally silent, however, on how the trial court is supposed to establish actual prejudice. Short of a juror admission, the court's assessment of prejudice is made based on its observations of the courtroom proceedings, including the behavior and expressions of witnesses and jurors. This Court routinely relies on the trial judge's assessment of bias and prejudice based on the court's actual observations in the courtroom. See, e.g., State v. Sharrow, 2008 VT 24, ¶ 9, 183 Vt. 306, 949 A.2d 428 (relying on trial judge's observation of juror in assessing possible bias). It is precisely because the trial judge has the unique ability to see and hear jurors, is "most familiar" with evidence, and has observed argument tone and juror reaction, that the appellate court should defer to the judge's assessment of whether bias was created. Arizona, 434 U.S. at 513-14 (explaining that trial judge's decision on whether an alternative is sufficient is entitled to deference). Indeed, the U.S. Supreme Court explained that because in most circumstances "the possible bias cannot be measured," the appellate court must "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." Id. at 511. I would accord such deference to the trial court's determination in this case.[12] Therefore, I dissent.

¶ 72. I am authorized to state that Justice Eaton joins this dissent.

_____
Chief Justice

_____

[12] Here, there is not merely the "bare assertion" of prejudice as alleged by the majority. Ante, ¶ 53. The majority does not dispute that defense counsel's statements about the victim were prejudicial. The questions were aimed at the credibility and character of the State's key witness on those charges. It is the extent of the prejudice on the jury that the trial court was in the best position to assess. On the record before us, this assessment was not in error.