<u>**ENTRY ORDER**</u>

2016 VT 26

SUPREME COURT DOCKET NOS. 2016-025 & 2016-033

FEBRUARY TERM, 2016

| | | |
|---|---|---|
| State of Vermont | } | APPEALED FROM: |
| | } | |
| v. | } | Superior Court, Orleans Unit, |
| | } | Criminal Division |
| Aaron Lontine | } | |
| | } | DOCKET NO. 593-11-15 Oscr |

Trial Judge: Howard E. VanBenthuysen

In the above-entitled cause, the Clerk will enter:

¶ 1.     Defendant, Aaron Lontine, appeals an order holding him without bail pursuant to 13 V.S.A. § 7553a.  The de novo single-Justice appeal was heard by Superior Judge Robert Bent, sitting by special designation.  See 13 V.S.A. § 7556(d); V.R.A.P. 9.  Defendant argued that the State failed to prove by clear and convincing evidence both that his release would pose a substantial threat of violence to another person and that no conditions of release could reasonably prevent such violence.  Defendant also argued that he was entitled to immediate release under 13 V.S.A. § 7553b(b) because a trial had not commenced within sixty days of his arraignment.  The request for release under § 7553b is denied.  The decision to hold without bail under § 7553a is reversed, and the matter is remanded for release of defendant under conditions.

## I.  Release Under § 7553b

¶ 2.     Defendant argues that he is entitled to release under 13 V.S.A. § 7553b.[1]  That section reads, in its entirety, as follows:

> (a) Except in the case of an offense punishable by death or life imprisonment, if a person is held without bail prior to trial, the trial of the person shall be commenced not more than 60 days after bail is denied.

---

[1]  This section is taken verbatim from the Vermont Constitution, ch. II, § 40(3):

> Except in the case of an offense punishable by death or life imprisonment, if a person is held without bail prior to trial, the trial of the person shall be commenced not more than 60 days after bail is denied. If the trial is not commenced within 60 days and the delay is not attributable to the defense, the court shall immediately schedule a bail hearing and shall set bail for the person.

(b) If the trial is not commenced within 60 days and the delay is not attributable to the defense, the court shall immediately schedule a bail hearing and shall set bail for the person.

This section has not been construed in any full-Court decision. It was mentioned in one single-Justice unpublished entry order, State v. Kelcey, No. 2002-398, 2002 WL 34422470 (Vt. Sept. 16, 2002) (unpub. mem.), https://www.vermontjudiciary.org/UPEO2001-2005/eo02398.aspx [https://perma.cc/9PGB-Y6ZC], but that case provides limited analysis. Defendant contends that pursuant to this section the operative date is arraignment, when he was first held, and because more than sixty days have passed without trial, the hold-without-bail order should be stricken and there should be an immediate hearing on conditions of release.

¶ 3.   The timeline is important to this argument. Based on docket entries, and the audio record of a status conference held on January 12, 2016, the court finds the following. Defendant was arraigned on November 17, 2015 on multiple felony and misdemeanor counts arising from events that took place between November 13 and 15, 2015. The charges included: three counts of first-degree aggravated domestic assault for threatening to use a deadly weapon against M.K. and attempting to strangle M.K.; one count of unlawful restraint; one count of interference with access to emergency services; and two counts of domestic assault for causing injury to M.K. or causing her to fear imminent serious bodily injury. The complaining witness was his live-in partner.

¶ 4.   On the day of arraignment, defendant did not complete a public defender application and a stand-in public defender handled the arraignment. An attorney or appear date was set. The court set a jury draw date of May 16, 2015. This and other preliminary dates were set and delivered to defendant.

¶ 5.   The State requested a hold-without-bail order, which was granted pending a weight-of-the-evidence hearing. The court advised defendant on the record that it would not set a weight-of-the-evidence hearing until requested by defense counsel. Defendant requested a public defender on November 25, 2015, and the court granted the request that same day.

¶ 6.   Counsel for defendant filed a motion to review bail on December 11, 2015. A hearing was held on December 23, 2015, and the case taken under advisement.

¶ 7.   A status conference was held on January 12, 2016. Defendant's attorney and the state's attorney were both present. The court, Judge VanBenthuysen presiding, inquired about the timetable for discovery. Defense counsel indicated a desire to depose the complaining witness, although it did not sound as though any notices of deposition had been given. Counsel inquired about where he stood with the time frames set out in § 7553b. The court advised it would be able to set the case at earliest in March. A decision on the bail issue was entered on January 14, 2016, holding defendant without bail.[2]

¶ 8.   Defendant has failed to demonstrate that § 7553b controls the status of bail in this case at this time. The critical question is the operative date for beginning the sixty-day period. The bail decision issued on January 14, thus the trial would need to start before March 14 pursuant to statute unless the operative date for such calculation is from the time of arraignment at which there was a hold without bail order made prior to the evidentiary hearing on the issue.

_____

[2] The delay in the case was caused by the admission of a several-hour-long video, which the court was unable to play. The technological problem was remedied just after the January 12, 2016 status conference and the decision issued two days later.

2

¶ 9.     In State v. Morey, No. 2007-421, 2007 WL 5313609 (Vt. Nov. 5, 2007) (unpub. mem.), https://www.vermontjudiciary.org/UPEO2006-2010/eo07-421.bail.pdf [https://perma.cc/F3S6-PXVR], a single-Justice decision, Justice Dooley distinguished a temporary hold-without-bail order pending the evidentiary hearing needed under § 7553a:

> Although the current bail order cannot be sustained, the court has discretion to hold a defendant without bail pending a hearing under § 7553a.  See State v. Bickel, 166 Vt. 633, 634, 698 A.2d 243, 243 (1997) (mem.).  The record in this case would support such an order.  For this reason, I do not strike the bail order but direct a hearing, to be held within ten days of this order, as to [whether] defendant can be held temporarily without bail, pending a new hearing under 13 V.S.A. § 7553a.

Morey, at *3; see also State v. Passino, 154 Vt. 377, 384, 577 A.2d 281, 286 (2004) (explaining that court can hold defendant without bail pending full bail hearing, and remanding for further hearing and holding defendant pending such hearing).  The statutory structure is sufficiently clear that the operative decision that triggers the sixty-day rule is the decision following the evidentiary hearing required under § 7553a.  The legislative and constitutional goal is clear and laudable: in nonlife-imprisonment cases, defendants held without bail get their cases tried on a priority basis.  That will include a substantial number of cases involving, as does this case, charges of domestic violence.  Therefore, in this case the time did not begin to run until the denial of bail after the evidentiary hearing.

¶ 10.     While the statute does not define what meaning to attribute to the phrase in § 7553b(b) "and the delay is not attributable to the defense," a reasonable interpretation of the statute would not permit a defendant to stipulate to, for example, a six-month discovery schedule and then invoke § 7553b(b) and claim the court was divested of authority to maintain the hold-without-bail order after two months.  The delay in trial pending pretrial discovery would be attributable to defendant within the meaning of the statute.

¶ 11.     At heart, § 7553b is a speedy trial rule.  It is a fundamental characteristic of speedy trial assertions that a defendant must make his or her desires to get to trial known to the court.  Indeed, this Court adopted this principle in response to U.S. Supreme Court precedent.  This adoption—as well as the four factors used to determine whether violation of the constitutional right to a speedy trial has occurred—was described in State v. Unwin, 139 Vt. 186, 424 A.2d 251 (1980).  There, this Court stated that "[i]n Barker, the Court specified four factors that must be considered in evaluating a speedy trial claim.  These are: the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant."  Id. at 195, 424 A.2d at 257.  In Unwin, the record did not "indicate that the defendant fulfilled his responsibility of asserting his right" because the defendant did no more than move to dismiss for lack of a speedy trial and file discovery motions demanding the production of items.  Id. at 196, 424 A.2d at 257.  In other words, the defendant did not adequately assert his right to a speedy trial.

¶ 12.     This Court has held similarly when other defendants have demonstrated little interest in a speedy trial.  See State v. Turner, 2013 VT 26, ¶ 11, 193 Vt. 474, 70 A.3d 1027 (holding that third factor did not weigh in defendant's favor because he filed only single motion to dismiss, never demanded immediate trial, and did not oppose extensive discovery); State v. Vargas, 2009 VT 31, ¶ 15, 185 Vt. 629, 971 A.2d 665 (mem.) (holding that "aggressiveness with

which defendant asserted his [speedy trial] right was lacking" because he merely filed one demand for speedy trial and opposed his original counsel's withdrawal).

¶ 13.   Following this precedent, it is clear in the present bail appeal that—to the extent that § 7553b reflects the right to speedy trial—defendant's failure to object to the pace of the trial process weighs against him.   At the January 12, 2016 status conference, counsel for defendant advised that he was not then ready for trial and that he wanted to take a deposition of the complaining witness and maybe someone else.   A discovery stipulation was filed on January 29, 2016 and established a trial date of May.   Defendant, although mentioning §7553b at the January 12, 2016 status conference did not give any indication that he objected to the pace of this process and stipulated to a May trial date.   Therefore, because § 7553b is akin to a speedy trial rule and is thus informed by U.S. Supreme Court and this Court's precedent, defendant, having failed to assert the right, cannot now assert it to have bail set.   For the foregoing reasons, defendant's request that this Court simply set bail under § 7553b is denied.

## II. Factual Findings Pertaining to Underlying Charges

¶ 14.   Defendant's second argument involves his appeal of the trial court's decision to hold him without bail under 13 V.S.A. § 7553a.   This Court held an evidentiary hearing on February 2 and 9, 2016.   Based on that evidence, this Court makes the following findings.

¶ 15.   Defendant and M.K. had been in an intimate relationship for approximately eight years.   Most recently they had been living on Glenn Road in Newport.   The parties shared their home with a joint child, L.L., and M.K.'s child, thirteen-year-old C.K.   M.K. is employed as a nurse at the local hospital.   M.K. is thirty-four, and weighs about 140 pounds.   Defendant is thirty-five, 5'10", and weighs about 300 pounds.

¶ 16.   On November 13, 2015, a Friday evening, M.K. went to a local restaurant with friends and was then joined by defendant and some of his friends.   Defendant expressed unhappiness with M.K. at being out with friends.   M.K. then went to a pub in Newport with her friends and defendant arrived there, again displaying unhappiness that she was out without him directly accompanying her.   Both were consuming alcohol.

¶ 17.   They returned home in the late evening.   Once there, M.K. started to take a shower as she usually did prior to initiation of sex by defendant as she assumed that is what he would want.   Instead, he asked her to play cards with him.   He appeared very intoxicated.   She told him she did not want to play cards and this provoked an argument about her not doing things he wanted to do.   In addition to being drunk, she suspected he had taken some of her prescribed Percocets.   She also had eight Lorazepam tablets missing.

¶ 18.   M.K. attempted to leave the bedroom to make herself a drink.   Defendant blocked her way and told her she was not leaving the room.   He then slapped her and ripped her pants off, then slapped her buttocks with such force she described it as feeling like she had been kicked.   Defendant called her a whore, slut, and bad mother and asserted that she wanted to have sex with "everybody."   She grabbed a phone as she attempted to leave the room in order to call for help.   He took the phone from her.

¶ 19.   Defendant finally let her out of the bedroom and she got a glass of water and then went back into the bedroom and got into bed.   Defendant's state of anger toward her continued.   Defendant pulled the blanket off her, slapped her buttocks again, grabbed her by the neck and choked her saying words to the effect that he could end it right then and if he did the children would not even miss her.   He then pulled a revolver out of the nightstand and put it to his head

and asked her to pull the trigger. He stated that he could kill both himself and her right then. He then demanded that she have sex with him and asserted that if she did not then he would "rape[] her in the ass and she would bleed for a week." He then passed out.

¶ 20.    M.K. did not leave the home. The next morning defendant acted like nothing had happened. However, he was unwilling to give her any time to herself and insisted on going to the store with her.

¶ 21.    The next night the couple went to the same Newport pub. There they met a man, Craig, of whom Defendant was jealous. They went to Craig's house after closing the pub and played pool. Craig gave M.K. a tour of his house. While there M.K. told Craig that defendant had hit her. Again both had been drinking. After being at Craig's house and playing pool for a while, they arrived home in the morning hours around 4:00 am.

¶ 22.    Defendant requested M.K. take a shower as he wanted sex. He started talking to her about her being unfaithful to him with Craig. M.K. declined to have sex. Defendant told her if she would not have sex with him, she would not sleep. He then wanted to know where her Percocets were. When she declined, he produced her grandfather's memorial veteran's flag and threatened to burn it if she did not give him the Percocets. She gave them to him and then threatened to leave.

¶ 23.    Defendant pushed her and slapped her in the face. In the kitchen he squeezed her neck telling her he could "choke her out" just then; that she did not deserve to live. Her airway was cut off. He called her a "stupid bitch." He slapped her buttocks again forcibly and she again felt it was as hard as a kick. M.K.'s lip was cut during the events in the kitchen. He repeatedly spoke of her wanting to "screw" Craig.

¶ 24.    M.K. and defendant went back into the bedroom where he repeatedly started to fall asleep then wake back up and poke M.K. He ripped a pillow she was holding apart. Before he went to sleep he was talking nonsense. During these events he was again highly intoxicated. M.K. had also been drinking, but the evidence does not support defendant's suggestion that her conduct, which included slapping him, precipitated the degree of violence she endured. M.K. had bruising as a result of defendant's kicking, grabbing, and hitting her. She did not require medical treatment. Photographic evidence shows some bruising on her left shoulder, left hip, and neck, an abrasion on her left cheek, and a small cut inside her lip.

¶ 25.    Defendant was abusive toward M.K. throughout the relationship. Early on it took the form of demonstrated anger and breaking wallboard in their home by punching it during his angry spells. In about 2008, he threw a large candle at her that hit her and hurt her, and when she was pregnant in about 2009, he pushed her and hit her head against the wall and said he hoped the baby died, articulating a suspicion that the baby was not his.

¶ 26.    During the past three years or so, he has grabbed her by the neck ten to fifteen times. The degree of pressure he used when doing so is not clear to the court, other than the most recent incidents charged in this case. Defendant had become intensely jealous for about the past year after finding emails on M.K.'s phone through her work account to another man. He told M.K. he had called that man and threatened to bury him next to his kids.

¶ 27.    During a significant portion of the relationship, defendant was using nonprescribed substances including methadone. Before M.K.'s pregnancy in about 2007, defendant had been taken aside by his older brother, who sternly told him he needed to clean up and treat M.K. better as his harsh conduct of her was apparent. He did so and his conduct toward

M.K. improved and his substance abuse came under control. His brother died about three years ago.

¶ 28.    Defendant exercised control of the money M.K. earned. He would go through her purse and take any cash. He has used her credit cards without her knowledge.

¶ 29.    The handgun defendant took from the drawer on November 13 belonged to his brother. There were also several long guns that belonged to his brother. The firearms have all been removed and are with relatives.

¶ 30.    Defendant has pointed the handgun at himself on several prior occasions since he started becoming suspicious of her fidelity. About six months ago, he thought he found more emails on her phone which suggested she was seeing someone else and they argued. As she was leaving, he told her he would be dead when she got back and upon leaving she heard a gun go off through the bedroom window. She was not threatened with it nor did he brandish it at that time.

¶ 31.    Prior to dating defendant, M.K. recalls seeing him rough up a prior girlfriend, putting her head through a wall.

¶ 32.    The parties' relationship had substantially deteriorated in the weeks prior to November 13 and they were exchanging ugly words. M.K. was contemplating ending the relationship by the weekend of the events charged.

¶ 33.    On Monday, November 16, M.K. went to work. Defendant called her as many as 47 times. He regularly would call her at 12:30 when she was at work. She perceived him to be checking on her. On one occasion recently she used her lunch hour to have one of the doctors remove a troubling IUD. She told defendant and he spoke of her as being "slutty."

¶ 34.    Defendant's parents live on Glenn Road about 1.6 miles from M.K. His relationship with his parents involves frequent contact and they have seen him and M.K. together at their home regularly. M.K.'s description of the relationship suggests that his parents are aware of his poor conduct toward her but they have not intervened.

¶ 35.    Defendant's parents testified. Defendant's mother Janice is fond of M.K. as well as of the children. She observed that both defendant and M.K. started drinking more heavily in the past six months following the death of a friend of theirs. Defendant's mother offered to take in defendant and has agreed that she would keep alcohol out of the house as well as take him to places he needed to go and would report violations of conditions of release. She does not believe her son assaulted M.K.

¶ 36.    Defendant has family ties within the community of Newport as well as a network of friends. Several testified. The court takes from their testimony that defendant was not perceived as being antisocial, but none of the "character" witnesses had close relationships with him.

¶ 37.    Defendant testified as well. He told the court that he recognizes that his relationship with M.K. is over and does not expect to be with her again. He admitted to having a "binge drinking" problem but believes he could cease drinking as he did for a lot of years, only recommencing significant alcohol use in the past year. In general he gave assurances to the court that he would abide by conditions of release if imposed.

¶ 38.   He also described his use of methadone from about 2004 until May or June of 2015, when he stopped with a doctor's help.  Defendant admitted to controlling behavior and his belief that M.K. was unfaithful to him.  He admitted to handling the handgun on November 13 and pointing it at himself.

¶ 39.   He describes M.K. as flailing at him and slapping him which precipitated him grabbing her.  Overall, his description of the events of November 13 to 15 placed both himself and M.K. as active participants in the violence instead of as she describes it.  He referred to his slapping her buttocks as having been done to "lighten the mood."  He denies the threat of anal rape narrated by M.K. as well as any threat to kill her.  He denied choking her but did admit to the slap that cut her lip.

¶ 40.   Defendant's past criminal record consists of a 2003 conviction for possession of marijuana and a 2004 conviction for snowmobiling under the influence.  He has a relatively minor motor vehicle record as well from 2000 to 2006.

### III.  Legal Conclusions Pertaining to § 7553a

¶ 41.   The general bail rule in Vermont is set forth in 13 V.S.A. § 7554.  The term "bail" as used in the statutes interchangeably means cash to be posted—the traditional meaning—but also is used more generally to mean release under some set of conditions with or without some form of cash guarantee of appearance including bonds.  See Black's Law Dictionary (10th ed. 2014) (defining bail as term used to mean both "security such as cash, a bond or property" and "process by which a person is released from custody either on the undertaking of a surety or on his or her own recognizance").

¶ 42.   The Vermont Constitution, like the Eighth Amendment to the U.S. Constitution, prohibits excessive bail.  In Vermont, the provision reads: "Excessive bail shall not be exacted for bailable offenses.  All persons shall be bailable by sufficient sureties, except as follows."  Vt. Const. ch. II, § 40.

¶ 43.   The Vermont Constitution contains two limited exceptions for holding a defendant without bail prior to trial, which are also codified in statute.  First, in cases where life imprisonment is a possible consequence of conviction, and where the evidence of guilt is great, the law allows a court to impose preventive detention through a hold-without-bail order, but authorizes the court to release a defendant on conditions as a matter of discretion.  Vt. Const. ch. II, § 40(1); 13 V.S.A. § 7553.

¶ 44.   Second, in cases where a violent felony is alleged, such as the aggravated domestic assault alleged in this case,[3] the law provides:

> A person charged with an offense that is a felony, an element of which involves an act of violence against another person, may be held without bail when the evidence of guilt is great and the court finds, based upon clear and convincing evidence, that the person's

---

[3]  This Court has held that bail cannot be imposed as a preconviction form of punishment for alleged conduct no matter how offensive that conduct may be.  State v. Blackmer, 160 Vt. 451, 459, 631 A.2d 1134, 1139 (1993).  To do otherwise would bypass one of the foundational principals of our criminal justice system, the presumption of innocence.  Since that decision, this second form of preventive detention has been added to the constitution and statutory framework in Vermont.  It requires stringent procedure and proof.

> release poses a substantial threat of physical violence to any person
> and that no condition or combination of conditions of release will
> reasonably prevent the physical violence.

13 V.S.A. § 7553a.  This provision is identical to the Vermont Constitution, ch. II, § 40(2).

¶ 45.    This is the exception relied on by the State in this case to request that defendant be held without bail.  The State has met its burden to prove that it has substantial admissible evidence to support its felony charges against defendant.  At the hearing, defendant conceded the State had met its burden on the weight of the evidence and this Court independently assesses the State as having met its burden.  The State's core task is thus to prove not only that it has sufficient admissible evidence to get the case to the jury, but also that upon release defendant will: (1) continue to pose a threat of physical violence as to any particular person, and (2) not respond to conditions of release designed to prevent the identified violence.

¶ 46.    The statutory design presents a substantial evidentiary burden for the State, the hardest part of which is the burden to prove that a set of facts exists as to future events.  The evidentiary standard to be applied to the analysis of facts found under § 7553a is the clear-and-convincing-evidence standard.  That standard is not an easy one for the State to sustain.  Given the significant deprivation of liberty that results from an order of continued treatment, the clear-and-convincing-evidence standard should operate as a fundamental caution upon the minds of all judges, barring such orders unless the evidence results in a firm conviction as to the truth of the allegations to be established.

¶ 47.    Clear and convincing does not mean, however, that the State's evidence must be wholly uncontradicted or unimpeached.  See In re N.H., 168 Vt. 508, 512, 724 A.2d 467, 469-70 (1998) (explaining that clear-and-convincing-evidence standard is "something less than proof beyond a reasonable doubt" but "substantially more rigorous than the mere preponderance standard"); Bishop v. Bishop, 961 S.W.2d 770, 773 (Ark. Ct. App. 1998) ("A requirement that the evidence be clear and convincing does not mean that the evidence must be uncontradicted.").

¶ 48.    The State must first prove that the person poses a substantial threat of physical violence to any person.  In evaluating this element, some attention must be paid to the statutory choice of words "substantial threat" of physical violence.  Those words lessen the burden on the State—that is, the State is not required to prove there will be physical violence, a virtual impossibility, but that there exists a strong possibility defendant will act to hurt another.  The quantity of violent conduct as well as the quality of the violence in this case is noteworthy.  The charged offenses took place in two separate incidents during one weekend but are connected together and to past instances of lesser abuse of M.K. by the threat of domestic violence and control.  Defendant was substantially intoxicated during the period he committed the acts for which he is charged.  He may have been engaging in polysubstance abuse as there is strong evidence he was using M.K.'s Percocets and drinking.  The Court finds that, as alleged, defendant's conduct was almost at a lethal level.  His argument that M.K. did not receive medical treatment for her injuries does not change that conclusion.  Several instances of choking and the introduction of a firearm into the assault, even if primarily pointed at himself, demonstrate to the Court that this was a near fatal encounter.

¶ 49.    Defendant's prior history of what could be referred to as tentative chokings—that is, his grabbing M.K. by the neck from time to time over the last three years—plus his use of a firearm, shot outside the house in punctuation of an argument, serve to broaden the Court's view of the period of violence directed toward the complainant.  The scope of violent behavior extends

8

back to the beginning of their relationship when he threw a heavy object at M.K. and injured her. The weekend comprising the events charged was, nonetheless, the highest level of violence between the parties.

¶ 50.   Defendant's threat to the man he believed M.K. was seeing also broadens the threat the Court believes he poses to M.K.  He had become obsessed over the question of M.K.'s fidelity.  Not being regularly employed, he perseverated on it, calling her daily at 12:30 during her lunch as an electronic tether to her.  In an effort to break with his history, defendant now states that he knows his relationship with M.K. is over.  The Court is not persuaded that he has so easily switched off what he spent so much time dwelling on.  The Court's experience is that in domestic violence cases it is not a safe assumption that the putative victim will be able to simply stay away from the alleged perpetrator and avoid the risk of future harm.  Various combinations of circumstances can easily be seen to exist where defendant and alleged victim would again find themselves together in the community if external controls are not imposed.

¶ 51.   The Court also makes note of his observed physically abusive conduct toward a prior partner as testified to by M.K., including putting his prior girlfriend's head through a wall more than a decade ago.  Even though this conduct did not result in criminal charges, nor has any of conduct resulted in criminal charges for domestic or physical violence prior to this case, he does have a long history of being aggressive toward women.

¶ 52.   The Court concludes that the State has satisfied its burden of proving that releasing defendant, without external control of some kind, would constitute a substantial threat of harm to M.K.

¶ 53.   The second element to be proved is that "no condition or combination of conditions of release will reasonably prevent the physical violence," and this must also be proved by the State by clear and convincing evidence.  13 V.S.A. § 7553a.  The Legislature has, in effect, required the State to prove a negative.

¶ 54.   This legislative requirement proceeds from the assumption that some defendants, once charged with a crime, will follow court directives concerning where they live, when they should be in their residence, and what contact they may have with an alleged victim.

¶ 55.   The usual manner of the State's proof is to point to instances of rule-breaking conduct in a defendant's past, notably a particular conviction history for failing to abide by court-imposed conditions such as conditions of release, prior probation violation conditions, or violations of relief-from-abuse orders.  Another manner of proof is to demonstrate that a defendant's conduct with respect to the current victim is based on such powerful emotions that the defendant will be unable to conform his or her conduct to the court's directives.

¶ 56.   Defendant's criminal history is minimal and old.  While the absence of such a history does not prevent the State from making its case, this fact is relevant.  It is significant to the Court that the State presented no evidence from defendant's period of incarceration that demonstrated an inability to follow the rules within the highly regulated day-to-day regimen of prison life.  As best the Court can tell he has had no disciplinary infractions.  When police came to get him he went quite docilely.

¶ 57.   M.K. described defendant's history to include a period in about 2008 when his late brother took him in hand and told him he needed to stop using drugs and alcohol and needed to appreciate the quality of his life with M.K.  Following that admonition, defendant was able to improve his disposition and treatment of M.K. for some period of time.

¶ 58.   The State has not met its burden of demonstrating by clear and convincing evidence that there are no conditions of release that will prevent future violence to M.K. Therefore, the decision holding defendant without bail is vacated.

¶ 59.   This case is therefore controlled by § 7554, and the Court must consider the appropriate conditions under which to release defendant.

¶ 60.   As to bail in its traditional sense—that is money or security to be posted—this Court has held that it may only be used to assure the return of a defendant to court and cannot be used as a form of preventive detention.  This Court explained:

> The sole support for the high cash bail requirement in this case is that defendant is charged with a very serious crime and faces a long period of incarceration.  The record contains no evidence on risk of flight beyond the charge.  If that alone were sufficient to set a high cash bail amount, the constitutional right to bail would be a nullity for all defendants charged with serious crimes. Accordingly, we cannot find on this record that the trial court had before it sufficient evidence to impose a $150,000 bail requirement.  13 V.S.A. § 7556(b); State v. Parda, 142 Vt. 261, 262, 455 A.2d 323, 324 (1982).
>
> In reaching this conclusion, it is important to emphasize the limits of this holding.  We do not hold that $150,000 bail is excessive solely because this defendant is indigent.  The purpose of bail is to assure appearance in court, State v. Pray, 133 Vt. 537, 542, 346 A.2d 227, 229 (1975), and defendant need not be capable of meeting bail in order for the amount to be supported by the record. In this case, however, the total lack of any evidentiary support for the bail amount set requires us to hold that the amount cannot be justified under § 7554 on this record.

State v. Duff, 151 Vt. 433, 436, 563 A.2d 258, 260-61 (1989).

¶ 61.   The Court concludes that defendant does not present a risk of flight for which monetary bail needs to be set.  He has deep roots in the Newport community: he was raised here and his parents and other family members live here.  Accordingly, cash bail, whose purpose is to ensure a return to court, is not necessary.  It is the question of preventive detention which must be addressed.

¶ 62.   The conditions of release which should be imposed are stringent and shall include at a minimum the following:

> (1) Defendant shall come to court as directed and shall keep his attorney and the court apprised of his address.  He shall not engage in violent or threatening behavior toward others.  He shall be placed in the custody of an appropriate person, as determined by the trial court, with whom he shall reside.  He shall not enter onto Glenn Road past his parents' home in the direction of M.K.'s residence or Prouty Drive except for emergency medical procedures.  He may not be on Glenn Road unless accompanied by the person approved as custodian.

(2) Defendant shall have no contact with M.K. including through third persons. He shall not place himself or remain within 300 feet of M.K., her residence, or her motor vehicle. He shall abide by a curfew of 5 p.m. Friday until 6 a.m. Monday and all weekday evenings from 6 p.m. until 6 a.m.

(3) He shall engage in substance abuse screening and treatment forthwith. Valley Vista is approved as a custodian for him. However, upon completion of the program or him leaving the program, he shall return to custody unless another custodian is approved. The Court does not approve his parents as custodians. The record allows for the conclusion reached by this Court that his parents have, to a large extent, enabled or, at the least, not acted to control his behavior and that he is able to bully his mother. The Court believes caution should be exercised in approving any sole female as a custodian for him.

(4) Defendant shall not possess firearms of any kind.

¶ 63. The matter is therefore remanded to the criminal division to approve a custodian and enter an order releasing defendant on conditions, including those set forth above. Defendant shall not be released until a proper Conditions of Release form is properly and completely executed.

<u>Reversed and remanded</u>.

FOR THE COURT:

Robert R. Bent, Superior Judge,
Specially Assigned

☒ Publish

☐ Do Not Publish

11