*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.*

VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      24-AP-163

# ENTRY ORDER

JULY TERM,   2024

State of Vermont v. Steven Perron*

} APPEALED FROM:
} Superior Court, Franklin Unit,
} Criminal Division
} CASE NO. 24-CR-05556
Trial Judge: Alison S. Arms

In the above-entitled cause, the Clerk will enter:

Defendant Steven Perron appeals from a superior court order holding him without bail pending trial, pursuant to 13 V.S.A. § 7553a.  He contends that his charge of aggravated assault with a deadly weapon, 13 V.S.A. § 1024(a)(5), does not contain an element involving an act of violence against another, that the State cannot otherwise meet its burden to hold him without bail under § 7553a, and that the Court should exercise its discretion to release him on conditions prior to trial.

Under Chapter II, § 40(2) of the Vermont Constitution and 13 V.S.A. § 7553a, a person charged with a felony offense involving an act of violence against another may be held without bail if the evidence of guilt is great, and the court finds that release would pose a substantial threat of physical violence to another, which cannot be reasonably prevented by setting conditions.  If a defendant is held without bail based on such a determination, the defendant is entitled to de novo review by a single Justice of the Supreme Court with no deference to the trial court's rulings.  Vt. Const. ch. II, § 40(2); 13 V.S.A. § 7556(d); V.R.A.P. 9(b).

On May 30, 2024, the State charged defendant with one count of aggravated assault with a deadly weapon under 13 V.S.A. § 1024(a)(5); one count of driving with a suspended license for driving under the influence (DUI); one count of violation of conditions of release; one count of DUI; one count of possession of a firearm by a prohibited person; one count of possession of LSD; one count of cruelty to animals; one count of simple assault; and one count of eluding a law enforcement officer.

The State moved to hold defendant without bail under § 7553a based on the § 1024(a)(5) charge.[1] The trial court held a hearing on the State's motion and determined to hold defendant without bail. Defendant then requested a new evidentiary hearing before this Court. 13 V.S.A. § 7556(d); V.R.A.P. 9(b).

## I. Evidence at Hearing

The Court held a de novo evidentiary hearing on July 3, 2024.[2] The parties stipulated to the admission of the transcript from the initial hold-without-bail hearing, which was held on June 6, 2024, and the admission of Exhibits 1 through 3 from that hearing. In addition, Heather Swensen testified at the hearing. The Court makes the following findings from that evidence by the clear and convincing standard.[3]

The facts necessary for the purposes of this hearing are not lengthy. Just after 10:00 p.m. on May 28, 2024, Mr. Joshua Reynolds called the Franklin County Sheriff's Office to report an assault. He said that the assailant, later identified as defendant, had pulled a gun on him and had left the scene. Deputies Gregory Stell and Ryan Nadeau responded. (The affidavits of the Deputies were admitted as Exhibits 2 and 3.)

Deputy Stell went directly to the home of Mr. Reynolds. He spoke with Mr. Reynolds and obtained Mr. Reynolds' sworn video statement, which was admitted as Exhibit 1. The substance of Mr. Reynolds' sworn statement indicates that he had only a very passing acquaintance with defendant and did not even know his last name until that evening.

---

[1] Under such circumstances, Chapter II, § 40 of the Vermont Constitution and 13 V.S.A. § 7553b also require that a defendant's case proceed to trial within sixty days, absent agreement to a greater period of time or other delay attributable to the defendant.

[2] On July 9, 2024, after this Court held the de novo evidentiary hearing, defense counsel filed a notice of conflict with this Court stating that she could no longer represent defendant due to a conflict of interest. Defense counsel did not otherwise indicate that this Court should avoid ruling on this matter. Therefore, this Court does not delay issuing a decision on the matter at hand.

[3] In State v. Madison, 163 Vt. 360, 370-72 (1995), this Court concluded that "review de novo" under the Vermont Constitution and 13 V.S.A. § 7556 did not automatically entitle a defendant to a second evidentiary hearing regarding hold-without-bail orders under § 7553a but that additional evidence could be heard based on a showing of "good cause." Vermont Rule of Appellate Procedure 9(b) was adopted to mirror that interpretation. The Legislature later amended the law to state that defendants were entitled to a full, de novo evidentiary hearing before a single Justice under such circumstances. 13 V.S.A. §§ 7555a(8)-(9), 7556(d). The language of V.R.A.P. 9(b) was not changed. Here, the parties agreed to the admission of the transcript of the initial hearing, to the admission of all exhibits, and to the testimony of Ms. Swensen at the second hearing. As a result, the Court has no present occasion to seek to harmonize or prioritize the directives of § 7556(d) and V.R.A.P. 9(b).

2

Nonetheless, defendant arrived at Mr. Reynolds' home and, essentially, invited himself in. Mr. Reynolds was in the home with his wife, ten-year-old child, and the family dog. Defendant was "pretty impaired" during the encounter and had brought a wine box to the property but was, at least initially, in "decent spirits." When he began aggressively playing with the dog, though, things changed. Mr. Reynolds told him to stop, but defendant did not. Eventually, the dog pulled off defendant's glasses. Defendant responded by hitting the dog three times. As Mr. Reynolds did not wish to escalate the situation, continue to see his dog hit, or expose his child to the encounter further, he asked defendant to leave. Defendant refused, became "belligerent," and attempted to pick a fight with Mr. Reynolds. After multiple attempts to start a fight and multiple unheeded requests for him to leave, defendant departed in what Mr. Reynolds thought was a car.

The encounter did not end there, however. Only minutes later, defendant returned to Mr. Reynolds' home on a white Honda motorcycle. Mr. Reynolds, again, told defendant to leave. He also said that he would contact law enforcement if defendant did not leave. Defendant said, "What's your problem?" He continued to approach Mr. Reynolds and tried to punch Mr. Reynolds, striking the glasses on his face. Mr. Reynolds and defendant began a physical struggle, during which defendant landed a blow that caused Mr. Reynolds some slight pain. Mr. Reynolds eventually put defendant into a headlock and tried to get him to calm down. When Mr. Reynolds felt that was accomplished, he released defendant. Defendant then pulled out a handgun and aimed it right at Mr. Reynolds' face. Fearful for his own safety and that of his family, Mr. Reynolds grabbed at the gun and was able to discharge the magazine onto the ground. (The magazine was later found to have been loaded with 9-millimeter hollow-point rounds.) Defendant then fled the scene with the gun on the white motorcycle.

As a result of the fight, Mr. Reynolds sustained some minor cuts and scrapes. Mr. Reynolds was and continued to be fearful of defendant during his video statement based on defendant's conduct towards Mr. Reynolds and his family.

Meanwhile, Deputy Nadeau had begun searching the environs for defendant. He located a white motorcycle with decals and attempted to stop it by activating his lights and siren. The motorcycle did not stop but raced away at speeds of over seventy miles-per-hour. Deputy Nadeau abandoned the highspeed pursuit at that time. Deputy Nadeau then went to a house belonging to defendant's brother to see if defendant sought refuge at that location. Deputy Stell joined him there as well.

At that point, the officers saw a white motorcycle with decals coming down the road by the property. The officers walked into the road and gestured to try to have the bike stop. Instead of stopping, the operator continued to drive in their direction and may have struck them had they not retreated. As the motorcycle went by, Deputy Nadeau was able to confirm that defendant was the operator.

The deputies got in their cruisers and, again, set out to find defendant in the night. Deputy Nadeau soon located defendant filling up his motorcycle at a local gas station. Defendant was visibly intoxicated. Deputy Nadeau placed defendant in his cruiser without

3

incident and awaited the arrival of Deputy Stell. Deputy Stell arrived at the gas station and assisted with the arrest, transport, and processing of defendant.

The deputies searched defendant and found LSD on his person. In addition, they learned that his license to drive was suspended at that time based on a prior DUI, that he was under conditions of release in a separate pending criminal matter requiring that he not drive a motor vehicle, and that he was prohibited from possessing a firearm due to a prior felony conviction.

At the initial hearing and the de novo hearing, defendant proposed that he be released to Heather Swensen as a responsible adult under 13 V.S.A. § 7554(a)(2)(A), along with monetary bail and various conditions that he asserted will address any potential concerns regarding his release. Ms. Swensen has known defendant since 2016. They began dating and lived together (with another person) between February and April of 2024. She has moved to Myrtle Beach, South Carolina, where she lives alone but is visited, at times, by her ex-husband. She proposed that defendant accompany her there to live during the pendency of the case. She stated she would ensure no drugs, alcohol, or firearms were on the premises and that she would use a lock box to secure her car keys. Although she testified that she did not believe defendant engaged in the assaultive behavior alleged in the Information, she agreed to call law enforcement if defendant violated any of his conditions of release. She testified that she was between jobs and could be present with defendant nearly all the time. She also stated that she would ensure that defendant appeared for court dates back in Vermont. She testified that she comes to Vermont every month-and-a-half to two months. She acknowledged that defendant has trouble with drugs and alcohol and that it is important for him to get treatment. She is not aware that he has had any completed treatment for substance abuse in the past, but she has begun to look into treatment options in South Carolina. The defense also represented that defendant would execute a waiver of extradition if requested by the State.

Defendant has a significant criminal history, although much of it is dated. He has four failures to appear. He also has the following convictions: DUI in 2018, escape from custody furlough in 2003, eluding a law enforcement officer in a negligent manner in 2003, and burglary of an occupied dwelling in 2002 (a conviction that prohibits him from possessing firearms). He served a sentence of incarceration between 2004 and 2007.

## II. Analysis

The State has asked the Court to hold defendant without bail under 13 V.S.A. § 7553a based on the charge of aggravated assault with a deadly weapon. The request involves a multi-step analysis. First, the charge lodged against defendant must be "a felony, an element of which involves an act of violence against another person," as that phrase is used in § 7553a and the identical constitutional provision on which it is based, Vt. Const. ch. II, § 40(2). Second, the evidence of guilt as to that offense must be great. Third, the State must establish both that: (a) "the person's release poses a substantial threat of physical violence to any person," and that (b) "no condition or combination of conditions of release will reasonably prevent the physical violence." 13 V.S.A. § 7553a. Finally, despite those findings, a court must consider whether to exercise discretion to release defendant in light of the factors in 13 V.S.A. § 7554 or other

4

considerations. State v. White, 2020 VT 62, ¶ 10, 212 Vt. 658 (mem.) (observing that courts have "narrow" discretion under such circumstances).

The Court will address each step of the inquiry.

## A. Felony Involving an Act of Violence

Defendant does not contest that aggravated assault with a deadly weapon under 13 V.S.A. § 1024(a)(5) is a felony. He maintains, instead, that the crime falls outside of the ambit of § 7553a because it does not contain an element involving an act of violence against another person. According to defendant, § 1024(a)(5) does not contain an element involving physical force or physical violence.

Determining whether a crime contains an element involving an act of violence depends upon the statute's language. See State v. Bulson, 2024 VT 15, ¶ 10 (mem.). The proper inquiry is the statutory elements of the crime that the State must prove "and not the evidence that will be offered to prove the felony." State v. Filippo, 172 Vt. 551, 552 (2001) (mem.).

Under § 1024(a)(5), a person commits aggravated assault if he or she "is armed with a deadly weapon and threatens to use the deadly weapon on another person." To sustain a conviction for this crime of specific intent, "the State must prove that defendant subjectively intended to threaten the individual with the deadly weapon." State v. Dow, 2016 VT 91, ¶ 8, 202 Vt. 616 (quotation omitted). For purposes of § 1024(a)(5), "to threaten another person means to communicate by words or by deed, an intent to inflict harm upon that person." State v. Cahill, 2013 VT 69, ¶ 17, 194 Vt. 335 (quotation omitted). "[W]hether conduct amounts to a threat is generally discerned from the perspective of a reasonable person under similar circumstances." State v. Gagne, 2016 VT 68, ¶ 23, 202 Vt. 255.

This Court has previously noted that the crime at issue here is "a felony charge that involves an act of violence." State v. Rheaume, No. 2018-269, 2018 WL 4210698, at *1 (Vt. Aug. 15, 2018) (unpub. mem.) [https://perma.cc/D3B3-4924]. Though that determination has some value, it appears that the question here was not squarely presented to the Court in Rheaume, which was decided on jurisdictional grounds. Accordingly, this Court addresses the merits of defendant's argument.

To determine whether a threat "to use the deadly weapon on another person" is "an act of violence", this Court turns to the plain language of § 7553a. See State v. Masic, 2021 VT 56, ¶ 16, 215 Vt. 235. Notably, the term "violence" is not defined in the statutory scheme at issue in this case. See State v. Combs, No. 23-AP-185, 2023 WL 4348874, at *3 (Vt. July 3, 2023) (unpub. mem.) [https://perma.cc/53N8-DRW7]. Under such circumstances, the plain meaning of the term "violence" can be drawn from dictionary definitions. State v. Blake, 2017 VT 68, ¶ 11, 205 Vt. 265.

In this instance, however, there is no need to start this inquiry with a clean slate. This Court has previously examined the definition of "violence" for purposes of § 7553a on a number of occasions. In State v. Madison, this Court relied on an expansive dictionary definition of

"violence" to include an "abusive or unjust use of power." 163 Vt. 390, 395 (1995) (mem.). Over twenty years later, that broad definition was endorsed in the probation context, with this Court also noting that one dictionary definition determines whether an act is violent by considering it "with reference to its effect on [the recipient]." See State v. Bryan, 2016 VT 16, ¶ 24, 201 Vt. 298 (alteration in original) (quotation omitted). Thus, we have held that the "creation of fear of imminent serious bodily injury is that type of abusive or unjust use of power contemplated by [§ 7553a]." State v. Watson, No. 2012-308, 2012 WL 6827284, at *2 (Vt. Oct. 3, 2012) (unpub. mem.) [https://perma.cc/7D6U-8YER].

The threatened use of a possessed deadly weapon against another person is precisely the sort of abusive and unjust use of power that fits within the definition of "violence" under § 7553a. When a person is armed with a deadly weapon and threatens to use that deadly weapon on another, the nature of that conduct is intrinsically violent under the noted definitions of that term. Quintessentially, it is an action "characterized . . . by unjust or improper force." Bryan, 2016 VT 16, ¶ 24. Accounting for the effects on a potential victim, as counselled by Bryan, the elements of the crime require a threat to use a deadly weapon and a resulting objective fear of bodily injury. No doubt, such conduct directly and "forcibly interfere[s] with personal freedom," id. (quotation omitted), and subjects the victim to the fear of "bodily injury" that amounts to the "type of abusive or unjust use of power contemplated by [§ 7553a]," Watson, 2012 WL 6827284, at *2. With the State required to prove both defendant's subjective intent to threaten to harm the victim with the possessed deadly weapon, Cahill, 2013 VT 69, ¶ 17, and that a reasonable person would fear bodily injury, Gagne, 2016 VT 68, ¶ 28, it clearly follows that this crime requires proof of an act of violence against another.

Buttressing this conclusion is the fact that the Legislature has expressly labeled aggravated assault under 13 V.S.A. § 1024 as a "violent" felony in other circumstances. Specifically, it has excluded § 1024 from the list of nonviolent felonies for purposes of probation. See 28 V.S.A. § 205(a)(3)(B)(i) (defining "nonviolent felonies" to exclude "a listed crime as defined in 13 V.S.A. § 5301(7)); 13 V.S.A. § 5301(7)(M). Accompanying § 1024 are several, obviously violent charges such as aggravated murder, 13 V.S.A. § 5301(7)(K); assault and robbery with a deadly weapon, id. § 5301(7)(N); and arson causing death, id. § 5301(7)(O). That the Legislature classified the entirety of § 1024 as a violent felony with various other indisputably violent felonies bolsters the conclusion that it also intended § 1024(a)(5) to qualify as a violent crime for purposes of § 7553a.[4]

Although defendant asserts that "violence" should be viewed as requiring some sort of physical contact between an individual and a victim, "violence" for purposes of § 7553a does not contain that requirement. State v. Madigan, No. 2011-103, 2011 WL 4974812 (Vt. Mar. 25, 2011) (unpub. mem.) [https://perma.cc/L4DH-Y3W8], does not warrant a different conclusion.

---

[4] While the listing lends additional support to the Court's conclusion, this Court does not mean to suggest that all "listed crimes" in § 5301(7) necessarily contain an element of violence for purposes of § 7553a.

That single-Justice decision ruled that the crime of lewd or lascivious conduct with a child under the previous iteration of 13 V.S.A. § 2602 did contain an element involving an act of violence because the crime "does not require touching or contact." Madigan, 2011 WL 4974812, at *3. Madigan, however, was superseded by statute. See 2015, No. 43, § 1. Additionally, the crime of lewd and lascivious conduct with a child and its elements are clearly distinguishable from those of aggravated assault with a deadly weapon and its elements, as described above. There is no sound basis to conclude that the term "violence" under § 7553a demands actual physical contact, despite Madigan's suggestion otherwise.

To adopt defendant's position would except from § 7553a's reach crimes that, although clearly involving an act of violence, do not expressly require proof of physical contact between a defendant and a victim to sustain a conviction. For example, a person who shoots a gun towards another but misses her target can be found guilty, inter alia, of aggravated assault by "attempting to cause serious bodily injury to another." 13 V.S.A. § 1024(a)(1); see State v. Downing, 2020 VT 97, ¶¶ 1, 7, 213 Vt. 643 (mem.), as amended (Oct. 29, 2020) (holding defendant without bail under § 7553a based on an attempt to cause serious bodily injury)[5]; cf. Watson, 2012 WL 6827284, at *2 (holding defendant without bail under § 7553a based on conduct of shooting a bullet within thirteen inches of victim, placing her in imminent fear of serious injury). The Court does not believe that the Legislature intended to exclude such crimes from the scope of § 7553a, and we avoid interpreting statutes that would lead to such absurd consequences. See Fraser v. Sleeper, 2007 VT 78, ¶ 12, 182 Vt. 206.

### B. Evidence of Guilt is "Great"

While the language of § 7553a speaks in terms of the weight of the evidence being "great," case law makes clear that the actual standard to apply is the same as that used to evaluate a motion to dismiss under Vermont Rule of Criminal Procedure 12(d). State v. Duff, 151 Vt. 433, 440 (1989). Under that rule, the prosecution must establish "by affidavits, depositions, sworn oral testimony, or other admissible evidence that it has substantial, admissible evidence as to the elements of the offense . . . sufficient to prevent the grant of a motion for judgment of acquittal at the trial." V.R.Cr.P. 12(d)(2); see State v. Turnbaugh, 174 Vt. 532, 532 (2002) (mem.). The ultimate question is whether the evidence submitted, "taken in the light most favorable to the State and excluding modifying evidence, can fairly and reasonably show defendant guilty beyond a reasonable doubt." Turnbaugh, 174 Vt. at 532 (quotation omitted).

In this case, defendant conceded at the hearing that the evidence of defendant's guilt at this preliminary stage and under that standard is "great."

### C. Clear and Convincing Evidence Requirements

---

[5] While the underlying conduct in Downing involved an actual physical altercation, the elements of the crime for which the defendant was held were based on an "attempt" to cause serious injury.

Portions of the analysis under § 7553a require the State to make certain showings by clear and convincing evidence. This is an exacting standard. As this Court has noted, it requires:

> somewhat less than evidence beyond a reasonable doubt, but more than a preponderance of the evidence. The clear and convincing standard does not require that evidence in support of a fact be uncontradicted, but does require that the fact's existence be highly probable.

Lanfear v. Ruggerio, 2020 VT 84, ¶ 18, 213 Vt. 322 (quotations omitted); see State v. Lontine, 2016 VT 26, ¶¶ 46-47, 201 Vt. 637, overruled on other grounds by State v. Downing, 2020 VT 101, ¶ 22, 213 Vt. 468.

The Court evaluates the evidence under that standard.

### 1. Clear and Convincing Evidence of Danger to Others

The State has established by clear and convincing evidence that defendant poses a significant danger to the public if he were released. State v. Woodcock, 168 Vt. 588, 590 (1998) (mem.) (stating that court can consider "general danger" to others in addition to danger to a specific individual). The evidence shows that defendant was under the influence and talked his way into a home of someone he barely knew. Once there, he refused commands to stop being aggressive with the family dog, struck the dog three times after the dog had pulled off his glasses, refused multiple requests that he leave, and attempted to goad Mr. Reynolds into a fight multiple times—all in front of a young child. Defendant then left the premises.

The time and distance afforded him a time to cool off, but such was not the case. Instead, he returned with a loaded 9-millimeter handgun.[6] Mr. Reynolds, again, told him to leave or he would "call the cops." Defendant approached Mr. Reynolds and took a swing at him, hitting his glasses. A struggle ensued during which defendant struck Mr. Reynolds. Mr. Reynolds was able to get defendant into a hold and tried to calm him down. When the matter seemed calm and resolved, Mr. Reynolds released defendant. Instead of being defused, however, defendant chose, again, to escalate the encounter significantly. He pulled the loaded handgun and pointed it right at Mr. Reynolds' face, which caused Mr. Reynolds to fear for himself and his nearby family. Fortunately, Mr. Reynolds was able to eject the magazine, and defendant fled the scene.

The danger he presented to others, however, did not dissipate. Deputy Nadeau encountered him on a public road and signaled for him to stop with his lights and sirens. Defendant fled apprehension, driving away at reckless speeds of over seventy miles-per-hour. The speed was concerning enough that Deputy Nadeau chose to end the pursuit.

---

[6] Defendant disputes that the evidence conclusively shows that he was not armed during the initial encounter. The persuasive inferences from the evidence point to the opposite conclusion. Nonetheless, even if the Court omitted that fact, defendant still chose to return to the property and initiate a potentially deadly physical confrontation.

Defendant's perilous conduct still did not cease. Deputies Nadeau and Stell soon located him on a different road. They walked into the roadway and signaled defendant to stop as he approached them. Defendant did not stop and continued to drive towards them. Deputy Nadeau persuasively averred that the officers had to move out of the way to avoid defendant and his vehicle. Deputy Nadeau later apprehended defendant who was under the influence and in the possession of LSD.

Defendant's conduct is very concerning in various respects. First, as to Mr. Reynolds, defendant's refusals to leave the home, his attempts to start a fight, his conscious decision to leave and return with a firearm, his decision to confront Mr. Reynolds a second time, and his decision to threaten him with a handgun after the situation had been calmed, all show a fixation and antipathy towards Mr. Reynolds. Though apparently of short vintage, the multiple missed chances defendant had to leave or avoid violence demonstrate that he has some untoward focus on Mr. Reynolds and continues to pose a danger to him and his family.

Second, the entire interaction with Mr. Reynolds was initiated by defendant in a random fashion. The evidence shows that he had only a very slight connection to Mr. Reynolds, had no prior reason to go to his home, and talked his way into the house. He was inebriated, chose to enter the home of someone he barely knew, and engaged in the assaultive behavior noted above concerning Mr. Reynolds and his dog. The presence of a child did nothing to dissuade defendant from the misconduct. Given those determinations, the Court also concludes defendant poses a danger to the general public on that basis.

Third, his conduct after the events shows that he presents an additional danger to the general public and to law enforcement. Defendant had the chance to pull to the side of the road when signaled to do so by Deputy Nadeau. He did not stop. He then chose to drive away at excessive and dangerous speeds, ignoring laws meant to protect the travelling public. Later, when signaled to stop by both officers in the roadway, he again refused. Instead, he drove towards and sped past the deputies, forcing them to move to get out of his way. His actions evince that he had little regard at the time for the safety of the public or of the deputies. Such conduct establishes that were defendant placed in similar situations in the future, he would, again, fail to submit to law enforcement and flee, thereby posing a clear danger to the travelling public, those on the sides of the roadways, and pursuing law enforcement officers.

Even more troubling is the fact that such conduct bears many similarities to defendant's past conduct as shown by his criminal convictions. Although defendant has no prior assaultive convictions, he has convictions for eluding law enforcement in a negligent manner, escape from custody, and burglary into an occupied dwelling. While defendant's crimes were committed long ago, the similarity to the conduct at issue here gives them more currency.

Lastly, the evidence also persuasively shows that substance abuse played some role in the events of May 29. Defendant has a conviction for DUI in 2018. Ms. Swensen acknowledged that defendant has trouble with drugs and alcohol, and she agreed that it was "important for him" to get treatment. To date, however, he has not completed such treatment.

Based on all those facts, the Court finds that the State has established by clear and convincing evidence that defendant, if released, poses a significant threat to Mr. Reynolds, the public, and law enforcement.

### 2. Clear and Convincing Evidence that Conditions Will Not Be Effective

The State has also established by clear and convincing evidence that no set of conditions can be fashioned to address the dangers noted above. The Court has little confidence that, on his own, defendant would abide by any conditions. He remains untreated for substance abuse and has shown no regard for following conditions and laws meant to protect the public. Specifically, along with the felony charge, he is charged with violating a condition of release that he not drive a motor vehicle, driving with a suspended license based on a past DUI, possessing a firearm despite being legally barred by statute from such possession, and eluding a law enforcement officer in a negligent manner. The Court's findings show strong support for those charges. The Court concludes that defendant is not at all likely, on his own, to follow conditions of release designed to protect others.

The Court has also considered carefully whether the added protection of a responsible adult, in the person of Ms. Swensen, could alleviate the dangers described in the prior section. The Court accepts Ms. Swensen at her word that she would take steps to ensure her house had no drugs, alcohol, or guns, and that she would call law enforcement if she saw a violation of the conditions of release. Those good faith representations do not go far enough in this case to assuage the concerns posed by defendant, however.

As the Court stated in Combs:

> No responsible adult can provide full supervisory oversight and protection, however. Responsible adults must sleep. Defendants can place themselves out of their supervisors' direct view for periods of time. Defendants can deceive responsible adults, despite their custodians' good faith efforts to be vigilant. . . .
>
> Additionally, even if the responsible adults were to call law enforcement if defendant drank and/or eloped with a vehicle, there could be a delay between when the event occurs and when it is noticed by the custodian. Another delay would extend from when the violation is reported to the point where law enforcement could apprehend defendant. Those periods of time present dangers to the public. Moreover, given his past conviction for attempting to elude and the eluding that has been established as to this event, there is a high probability that defendant would not stop for law enforcement willingly and would, again, attempt to avoid capture. The perils presented by that scenario are palpable.

Combs, 2023 WL 4348874, at *6.

Such fears are exacerbated in this case by a number of factors. First, as previously described, defendant remains untreated for substance abuse, and substance abuse fueled the irrational, threatening, and unsafe behavior of May 29. There is no present and concrete plan for substance abuse treatment.[7]

Second, the proposal is for defendant to reside in South Carolina. The suggested placement poses additional concerns. In South Carolina, Vermont officials have no authority or ability to monitor his compliance with conditions of release. They are left only to trust that the conditions are being followed, with little ability to verify that fact or even gather evidence to prove a violation if one occurred.

Third, many of the proposed conditions of release police what otherwise would be lawful behavior, such as the consumption of alcohol. While that conduct in violation of a Vermont condition of release is a violation of Vermont law, it would not necessarily be a violation of South Carolina law. The Court has been pointed to no basis upon which South Carolina law enforcement would have an obligation to investigate such conduct. Nor, absent a Vermont-generated arrest warrant, has the Court been directed to grounds on which they could arrest defendant for such activities.

Fourth, Ms. Swensen testified that she comes to Vermont as often as every month-and-a-half. The proposed conditions, however, say nothing of where defendant would be during those visits, where he would stay for purposes of curfew, or exactly how he would be supervised.

Ultimately, the proposal to have defendant travel over 1000 miles away from Vermont to reside in a separate sovereign state raises almost as many questions as it answers.

At the end of the day, each defendant must choose to comply with conditions of release. Here, the Court does not have confidence that, even with the proposed responsible adult, defendant would choose or be able to follow conditions of release and would not somehow locate inebriating substances, vehicles, or firearms, and engage in similar behavior to that at issue in this case. As this Court has noted in considering responsible adults in the past:

> Even assuming the monastic residence can provide supervision twenty-four hours a day, seven days a week, as proffered by defendant, it is not guaranteed and is entirely dependent on defendant's voluntary compliance. Mother's credible commitment to call police in the event of defendant drinking or absconding is still no prophylactic to defendant's demonstrated dangerousness. Mother's custody of defendant would be unsecured. Alcohol is ubiquitous and available almost at will. Defendant cannot be relied upon to abide by no-alcohol conditions of release and does not obey court orders. Short of actual custody without access to alcohol, the real

---

[7] At the first hold-without-bail hearing, defendant proposed going to Valley Vista for treatment. No actual plan for treatment in either Vermont or South Carolina was presented at either hearing.

11

> risk of defendant drinking and resorting to life-threatening violence cannot, as a practical matter, be reasonably controlled.

State v. Steuerwald, 2012 VT 98, ¶ 16, 193 Vt. 663 (mem.).

Just as in Steuerwald, the Court concludes that the State has established that the proposal to release defendant to Ms. Swensen with the accompanying conditions will not fully diminish the harms identified above and defendant, if released, would remain an ongoing danger to others.

### D. Discretionary Release

Having made the preceding determinations under § 7553a, there arises "a manifest need for incarceration . . . . In other words, once the elements of § 7553a are satisfied, there is no safe basis to release the defendant." State v. Lohr, 2020 VT 41, ¶ 14, 212 Vt. 289. Still, the Court retains some discretion to release defendant in light of the factors set out in § 7554 or others raised by defendant. White, 2020 VT 62, ¶ 10. Though such discretion exists, its scope is quite "narrow." Id.

In this case, defendant has not proffered convincing considerations under § 7554 or otherwise that might warrant his release as a matter of the Court's discretion. Defendant notes that he has a place to live in South Carolina but, as described above, that location does not assist his cause. He also suggests that he may not be able to be tried within sixty days. The Court has no convincing evidence on that point but, even if true, defendant's remedy is that bail and conditions of release would need to be considered at that time. See Downing, 2020 VT 97, ¶¶ 25-28 (holding that defendant could be held under § 7553a despite concern that trial would not be held within sixty days). The Court is simply not persuaded that this is the rare case where it should exercise its narrow discretion to release defendant despite the hold-without-bail findings made under § 7553a.[8]

The order holding defendant without bail under 13 V.S.A. § 7553a is affirmed.

---

[8] While separate from the § 7553a analysis, defendant also poses a significant risk of flight. His past record of eluding and escape, his four failures to appear, and his conduct in this case of eluding law enforcement on two separate occasions warrant significant bail. The prospect of defendant moving to South Carolina would raise that bail figure, even if he were to sign a waiver of extradition and assuming such a prospective waiver would be enforceable.

FOR THE COURT:

Timothy B. Tomasi, Superior Judge,
Specially Assigned